## THE ANNIE L. VANSCIVER.

(District Court, E. D. Virginia. April 22, 1908.)

SHIPPING—INJURY TO PASSENGERS—NEGLIGENCE IN HANDLING LINES ON CROWDED FERRYBOAT.

A steamer running as a ferryboat between Newport News and Sewell's Point, one of the landings for the Jamestown Exposition, on what was called its "workmen's trip" early in the morning, as usual on such trips carried its full complement of 500 passengers, who were so crowded that they were obliged to stand close together on both decks. Libelants, who were carpenters working at the Exposition, stood with many others on the bow end of the main deck. The lines used to make fast the boat were coiled across such part of the deck. On reaching the landing when the lines were drawn out, libelants' feet were caught in the coils, and they were seriously injured. They testified that they did not see the ropes, owing to the crowd in which they were packed. *Held,* that those operating the vessel were chargeable with negligence which rendered it liable for the injuries in permitting the passengers to crowd, without warning, within the coils of the lines, or in not so coiling or handling the lines as to remove the danger; that libelants under the circumstances were not guilty of contributory negligence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 544, 551.]

In Admiralty.

These two libels, heard together by consent of parties, as they depend upon the same state of facts, are to recover for injuries received by the libelants on April 11, 1907, while passengers on the ferry steamer Annie L. Vansciver plying on the waters of Hampton Roads between Ivy Avenue Pier, Newport News, Va., and Pine Beach, or Sewell's Point, Va., one of the landings for the Jamestown Exposition. The libelants are carpenters, and at the time of the accident lived on the Newport News side of the Roads, and were employed at the Jamestown Exposition, which necessitated their taking passage on the Vansciver to get to their work. On the morning in question they boarded the Vansciver at Ivy Avenue Pier about 7:30 to go to Pine Beach, en route to the Exposition grounds, that being the first regular morning trip made by the vessel between the points named, and which was known as the "workmen's trip," and on which trips only passengers were transported. The vessel on this morning carried the largest crowd, some 500, she had ever taken across, and many passengers had to stand on the main and saloon decks and in the saloon, because there were not sufficient seats for all. Quite a number, including the libelants, not being able to get seats, went

below on the main deck. which was also crowded, and one of the usual places for passengers to congregate, where they were allowed to smoke. Across this deck, forward of the gangway, the lines used in making the steamer fast to the pier had been placed by the crew having charge of them so as to lie from port to starboard of the vessel in long coils, closely formed, with loops at each end, making a compact surface apparently, and which the libelants did not see or observe, nor was their attention called thereto by any one, and the crowd being so great that passengers could observe but little as to the condition of the deck. These libelants continued to stand on this deck without objection through the trip across Hampton Roads, and while so standing, just prior to the steamer's approaching the pier at Pine Beach, there being no obstruction to prevent the passengers on the upper deck from crowding down the companion way to the main deck, a large number of passengers from the upper deck came down to the lower deck, so increasing the crowd on the main deck as to fill the gangway space. Upon the vessel's arriving at her destination, and attempting to make fast, in some manner the libelants, without warning, were each suddenly caught and entangled in one of the ropes used in making fast to the pier, dragged to the side of the vessel, cutting off one of Saunders' feet, and breaking one of the legs of Fernin, causing a serious and permanent injury thereto.

George C. Cabell and Edward R. Baird, Jr., for libelants.
W. H. Venable and Hughes & Little, for respondent.

WADDILL, District Judge (after stating the facts as above). Many acts of negligence and want of proper care for the libelants as passengers are charged against the respondents, and, likewise, the respondents aver that the libelants were negligent in many respects contributing to their own injury, and should not on that account recover; and on these issues thus joined between the parties considerable testimony, as well of passengers upon the vessel as of the libelants and officers and crew of the steamer, was taken orally before the court, in which there is much conflict, though on the crucial questions affecting the causes of the accident, as viewed by the court, there is but little difference. The cases turn upon whether the libelants were guilty of such contributory negligence in taking and remaining in the positions they did as passengers on the vessel as to disentitle them to recover for the injuries sustained by becoming entangled in the boat's lines used in making her fast at the point of destination. Ordinarily it may be conceded that passengers who expose themselves to dangers incident to landing, while the officers and crew of the vessel are making the ship fast, such officers themselves being in the exercise of proper care and caution, with a properly equipped steamer, would be disentitled to recover; but just what the passenger should do, and where he should remain, while the ship is making fast must necessarily depend upon the character of the vessel, and the number of passengers aboard. In this case the conditions were such, having regard to the large number of passengers carried on a vessel of the size of the Vansciver, her licensed capacity being 500 (though she had a permit of local inspectors, so far as the waters of Delaware River were concerned, to carry 280 additional), that at the time of the accident, she having about her licensed number of passengers, especial care should have been exercised to avoid the very accident which occurred. This vessel was being used as a ferry steamer, over a route on which, by reason of the Jamestown Exposition, there

was very heavy travel, and it was known to the officers that the vessel at this hour would be crowded to her full capacity, and the respondent should, therefore, have provided commensurate safeguards against accidents such as occurred to the libelants. The libelant Saunders, who was making his third trip on this boat, thus described his conduct on the occasion:

"I came in on the express car, the last car, and, when I got to the pier, I noticed the upper deck seemed to be crowded to its utmost. I noticed that they blocked the door of the saloon, and were standing against that, and had closed the door, and no one could get in, and I went on the forward gangplank, and as far as I could see pretty much every place was taken up by passengers, and there was a space right where the gangplank went out, where no passengers were standing, and I went forward and crowded myself up right up against the passengers, and still left that open for the gangway, and stood with my back to the bow of the boat.

"Q. Did you observe the presence of ropes or other things on that part of the deck where you were standing?

"A. No, sir; I never saw any rope at all. The passengers were crowded in the bow of the boat as thick as they well could stand, and I backed up into the crowd in order to get away from the gangplank, and where I was standing apparently was as clear as this floor, as far as I could see."

He further testified that he had no knowledge of the existence of the rope, heard no warning on the part of any one to change his position, or to stand back, or get out of the way, and that he never saw any officer of the vessel on the deck where he was standing. "The first I knew I was caught in the rope. Where it came from or anything I do not know. My leg was caught, and I was first dragged a little to the bow of the boat, and then carried to the hawsepipe, and I was dragged some little distance before I fell. The passengers were so thick that I could not fall until I got to the hawse hole. I was held up by the passengers they were so thick, and in that way I never saw the rope at all until after the accident had occurred. As the rope tautened on me, it seemed to pull me to the side of the boat, and, when my leg went to the hawsepipe, I felt there was quite a rush of passengers, and I never saw the rope at all, and did not know there was a rope until I was caught in it." George W. Dean, mate of the Vansciver, and in charge of her navigation at the time of the accident, a witness examined by the libelants, in describing the circumstances of the landing, says:

"I stopped the boat as soon as she was in position, and I got the other line out, and got the boat in position. The crowd commenced falling aft. It was a matter of impossibility to get from the pilot 'house down through the crowd. no matter what hurry you are in, until they can get away from the stairway."

And the captain of the vessel, examined by the respondent, in answer to a question as to what precautions had been taken prior to the accident to prevent passengers coming down on the freight deck from the upper deck, and what he did as to keeping them off until the landing was made, answered:

"We asked them not to do it, and keep clear of the gangboard, and not go forward of the gangboard, and we would rather not have them go on that deck.

"Q. Did you do anything to keep them off?

"A. Yes, sir; we stand at the gangway and keep pushing, 200 or 300 of the crowd behind them pushing them down on you, and shoved you on the deck, and I put lines up. and they cut them, and untied them, and we did not do it. After that I stopped using the lines, and ordered gates to be put up there, and put them up as soon as I got them, and they stopped them some little, but not much. They got over them after I put them up."

With a vessel crowded as this was at the time of the accident, of which the respondent had full knowledge by reason of carrying the same crowd substantially daily, and the likelihood of danger to passengers, it should not escape liability for the failure to properly provide for the holding back and detention of the crowd in a place of safety until the boat could be made fast; and there was no excuse for allowing this crowd to fill up the entire standing space of the boat on all of her decks, and at the same time so stretch and place the lines upon and across the bow of the boat as to endanger the lives and limbs of passengers allowed to stand in the bow by their becoming entangled in the lines when making the vessel fast. To place these lines, as was done, across the bow of the boat, with loops in each end so the lines could be drawn to the side of the steamer on which the landing happened to be made, with the bow of the steamer filled with passengers, would almost inevitably result in causing just such an accident as took place here. Knowing the size of the crowd to be handled, and the difficult landing to be made, at exposed points on Hampton Roads, common prudence required that these passengers during the landing should have been locked out of or entirely cut off from the place at which the lines were handled, and the gangboard thrown out; and if this precaution was not taken, and, on the contrary, the whole bow of the boat from which the landing was to be made was filled with passengers, to further endanger them by spreading the lines athwartship, from port to starboard, instead of safely coiling the same on each side of the boat, was culpable negligence. That the respondent knew of the necessity for this precaution, so far as holding the passengers back until the boat was made fast, was manifest; and, besides, they had previously to this trip used ropes across the companion way from the upper to the lower decks. and had taken the same down with a view of substituting gates, and this occurrence took place between the removing of the ropes and the placing of the gates, and was almost inevitable with a crowd thus turned loose, and lines so placed on the deck, and the vessel taxed to its utmost capacity.

Libelants insist, further, that there was a defective snub line in use by the Vansciver at the time of the accident, and that she had neither a competent nor sufficient complement of employés engaged in and about the landing of the steamer, taking into account the number of passengers on board and the character of landing to be made, and, also, that she negligently entered the slip at too high a rate of speed. There is much force in these contentions, and considerable evidence to sustain the same; and the court thinks it is highly probable that one and all of them to some extent entered into the happening of the accident; but the real cause thereof, in the opinion of the court,

was the failure of the respondent to properly provide for the control of the crowd such as was on board at the time of the landing, and the negligent placing of the line across the bow of the vessel, in view of the fact that passengers were invited to occupy the same, and it was necessary for them to do so because of the large crowd carried.

The court finds that the libelants were not guilty of any negligence, such as would disentitle them to recover, under the circumstances of this case, and the only question remaining is the ascertainment of the damages they are respectively entitled to.   The libelant Saunders sustained the loss of one foot, which was amputated above the ankle, and Fernin a broken leg, the ends of the bone of which have not yet formed a union, owing to his physical condition, and may not do so for a long time to come.   Both libelants were great sufferers, were long confined to the hospital, especially Fernin, who at the time of the trial was under the care of his physician, and each of them was. able to stand only by the aid of crutches.   They were both carpenters,. and aged Saunders 55 and Fernin 24, and at the time of the accident were receiving high wages at the Exposition, namely, $4.50 per day, and had been receiving the same for some time, their usual compensation being $2.50 to $3.

The court believes, under all the circumstances, that an award to Saunders of $4,000 and to Fernin of $3,500 should be made, and decrees may be entered for the same, respectively.

---

## UNITED STATES v. COMSTOCK.

(Circuit Court, D. Rhode Island.   May 11, 1908.)

### No. 2,622.

1. INDICTMENT AND INFORMATION — OFFENSE UNDER BANKRUPTCY ACT — CONCEALMENT OF PROPERTY.

The provision of Bankr. Act 1898, c. 541, § 29a, 30 Stat. 554 (U. S. Comp. St. 1901, p. 3433), subjecting any person to criminal prosecution for "having knowingly and fraudulently concealed while a bankrupt, or after his discharge, from his trustee any of the property belonging to his estate in bankruptcy," sets forth all the elements of the offense, and an indictment in the terms of the statute is sufficient.

2. BANKRUPTCY—OFFENSES—CONCEALING  ASSETS—INDICTMENT—SUFFICIENCY— "CONCEAL."

The word "conceal," as used in said section, is of plain import, and, when coupled in an indictment with the words "unlawfully, knowingly, and fraudulently," clearly excludes unintentional acts.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 2, pp. 1377, 1382.]

3. SAME.

It is not an essential element of the offense under such provision, which. must be averred in the indictment, that the bankrupt at the time of concealing his property knew either the fact that a trustee had been appointed for his estate or the name of the trustee.

4. SAME—MODE OF CONCEALMENT.

In an indictment under such provision the manner of concealment need not be set out.

**5. INDICTMENT AND INFORMATION — OWNERSHIP OF PROPERTY — SUFFICIENCY OF AVERMENT.**

An averment in such an indictment that defendant concealed property "which then and there belonged to the estate in bankruptcy" sufficiently alleges the ownership of the property, and is not rendered insufficient or uncertain by further averment that the property was "then and there the personal property of" the bankrupt, which must be construed in conjunction with the prior averment. But, even if the two be regarded as repugnant, the latter will be rejected as surplusage, and will not vitiate the indictment.

On Demurrer to Indictment.

C. A. Wilson, U. S. Atty., and Geo. H. Huddy, Asst. U. S. Atty. W. H. Barney and J. J. Hahn, for defendant.

BROWN, District Judge. The bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 554 [U. S. Comp. St. 1901, p. 3433]) in section 29a refers to the offense of having "knowingly and fraudulently (1) concealed while a bankrupt, or after his discharge, from his trustee, any of the property belonging to his estate in bankruptcy."

The indictment uses the words "unlawfully, knowingly and fraudulently" to characterize the word "conceal." Upon demurrer, it is contended that no wrongful intent is sufficiently charged by these words. The terms of the statute, however, are themselves inconsistent with an honest or lawful purpose, and set forth all the elements of the offense. In such case it is sufficient to charge the offense in the terms of the statute.

The defendant assigns as cause of demurrer the omission of the word "willfully." The language of the statute used in the indictment is the substantial equivalent of a charge that the defendant did willfully conceal. Bullis v. O'Beirne, 195 U. S. 606–617, 25 Sup. Ct. 118, 49 L. Ed. 340.

The term "conceal," itself a word of plain interpretation (U. S. v. 350 Chests of Tea, 12 Wheat. 493, 6 L. Ed. 702), when coupled with the words "unlawfully, knowingly, and fraudulently," plainly excludes unintentional acts. In the case above cited the question arose of the meaning of the word "concealed" in the act of March 2, 1799 (chapter 22, § 68, 1 Stat. 678), and the court said:

"The term 'concealed' used in this section is one of plain interpretation and obviously applies to articles intended to be secreted and withdrawn from public view on account of their being so subject to duties, or from some fraudulent motive."

The word "conceal," according to chapter 1, § 1, subd. 22, Bankr. Act, shall include "secrete, falsify, and mutilate." See, also, 8 Cyc. 543.

It is further assigned as cause of demurrer that it does not appear that at the time of the supposed concealment the defendant knew that Arthur P. Johnson had been duly appointed trustee of his estate in bankruptcy. I am of the opinion that it is not an essential element of the offense that the bankrupt at the time of concealing his property should know either the fact that a trustee had been appointed or the name of the trustee. Otherwise the statute would be deprived of much of its force.

· For example, after the filing of the petition and before the appointment of the trustee, the bankrupt might dispose of his property and absent himself from the jurisdiction, or willfully avoid all knowledge of the appointment of a trustee, and thereby relieve himself from punishment under the act, although having effectively concealed his property from his trustee and from his creditors.

The case of Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, is not in point. There knowledge or notice was an essential part of the offense. The offense of concealment of goods may be completed by a physical act intended or calculated to prevent a trustee when appointed from securing the goods, and the character of the offense is in no way dependent upon knowledge that a particular person is clothed with legal authority.

It is further urged that the count is defective, in that there is no explanation of the word "conceal," and no specifications whatever in relation to it. The defendant relies upon United States v. Carll, 105 U. S. 611, 26 L. Ed. 1135; Evans v. United States, 153 U. S. 584–587, 14 Sup. Ct. 934, 38 L. Ed. 830; Batchelor v. United States, 156 U. S. 426–429, 15 Sup. Ct. 446, 39 L. Ed. 478; United States v. Cruickshank, 92 U. S. 542, 23 L. Ed. 588; United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516.

The argument is that as the statute says that the word "conceal" shall include "secrete, falsify, and mutilate," three acts widely different in their nature, the indictment should define which one of these acts is intended. The decisions of the Supreme Court as to the words "willfully misapply" in the laws relating to national banks do not seem to be applicable. As the words "willfully misapply" in the statute did not set forth all the necessary elements of the offense, it was considered not sufficient to charge the offense in the words of the statute.

Under the statute now in question, the mode of concealment is entirely immaterial. The word "fraudulently" limits the word "conceal," and supplies the element of criminality which was not contained in the words "willfully misapply," which were not limited by express terms, but by construction of the statute in view of the subject-matter. It was necessary, therefore, that this limitation arrived at by construction should be set forth in the indictment in specific terms; for otherwise the terms of the indictment addressed to a defendant, informing him of the nature of the act with which he is charged, would be broader than the true import of the statute. By this indictment the defendant is charged with fraudulent concealment of goods, and is given due notice that evidence may be offered against him of various modes of concealment.

To require the government to specify a particular mode of concealment would unnecessarily limit it to a particular mode, and deprive it of the right to introduce evidence that all the modes of concealment— the actual hiding of goods, hiding of books, accounts or documentary evidence by secreting or mutilating the same, etc.—were used.

It is unnecessary to set forth the evidence upon which the government relies, and the defendant, as in ordinary cases, must take notice that any testimony relevant to the question of fraudulent concealment may be introduced against him.

It is further urged that the allegations of the ownership of the property supposed to have been concealed are also uncertain and repugnant. The indictment first charges that the defendant "did conceal a large amount of personal property which then and there belonged to the estate in bankruptcy, to wit, a large number of cases containing shoes and footwear of leather and rubber, of great value; to wit, of the value of ten thousand dollars, a more particular description of which is to the grand jurors aforesaid unknown."

No allegation of ownership is made essential by the statute, save that the property was "belonging to his estate in bankruptcy." These words have a definite signification throughout the bankruptcy act, and no doubt can arise as to their meaning. A question of some importance, however, arises from the fact that in the concluding portion of the indictment the following language occurs:

"And the personal property aforesaid was then and there the personal property of the said Benjamin W. Comstock, and then and there belonged to his estate in bankruptcy, as the said Benjamin W. Comstock then and there well knew."

It is argued that, as it is alleged that the property was then and there the personal property of the said Benjamin W. Comstock, it did not belong to his estate or to his trustee in bankruptcy, and that he therefore had the right to conceal it. This argument seems to me to be founded upon a misreading of the language of the indictment. The statements that the personal property was the personal property of Benjamin W. Comstock, and then and there belonged to his estate in bankruptcy, are conjunctive in the indictment, and it can hardly be inferred, according to the natural import of this language, that the pleader has charged that it did not belong to his estate in bankruptcy.

It is usual to speak of the property of the bankrupt, or of the bankrupt's estate, even after the title of the bankrupt is vested in the trustee under section 70.

If, however, we admit that upon a strict construction there is a repugnancy beween the allegation that the property was the personal property of Benjamin W. Comstock and the allegation that it then and there belonged to his estate in bankruptcy, this does not vitiate the indictment. It is said that, where a repugnant matter is inconsistent with some preceding averment, it may be rejected as surplusage, and there is quoted the language in Wyatt v. Alard, Salk. 325, that:

"Where matter is nonsense by being contradictory and repugnant to somewhat precedent, that the precedent matter which is sense shall not be defeated by the repugnancy which follows, but that which is contradictory shall be rejected."

See Clark's Criminal Procedure, 179, 180; Bishop's New Criminal Procedure. §§ 489–491.

In the body of the indictment there is a preceding allegation that the personal property then and there belonged to the estate in bankruptcy. Under the foregoing rule, this allegation may stand, and is

not destroyed by the subsequent allegation even if that be so narrowly construed as to involve repugnancy, though when fairly construed conjunctively the meaning is clear, though perhaps informally expressed. Whether a defect of this character is cured by section 1025 is doubtful.

Many other points have been raised upon demurrer, but it does not seem necessary to deal with them specifically. While the indictment is open to technical criticism, I have no doubt that it fully and completely apprises the defendant of the offense wherewith he is charged, that it enables him to prepare to meet a specific charge, and that a conviction upon this indictment would be a bar to a subsequent indictment.

The demurrer is overruled, and the defendant will plead to the indictment.

---

## PREST-O-LITE CO. v. AVERY LIGHTING CO.

(Circuit Court, N. D. New York. May 18, 1908.)

TRADE-MARKS AND TRADE-NAMES—INFRINGEMENT—UNFAIR COMPETITION.

Complainant manufactures and sells for use on automobiles patented tanks containing acetylene gas. It packs such tanks with asbestos, and charges them with gas by a method of its own, and keeps a record of each tank, which is numbered. When the gas is exhausted, it exchanges a filled tank for the empty one which it repairs, repacks, if necessary, and refills. Each tank bears a metal plate on which is engraved complainant's trade-mark for its gas, "Prest-O-Lite," the number, and a patent notice. Defendant, which is a competitor in business making and selling tanks and gas under a different name, buys or exchanges for empty tanks of complainant and refills and resells the same without removing the plate, but in some cases covering a part of the same by a paper label easily removed, stating that the tank had been refilled by it. *Held*, that the same was an infringement of complainant's trade-mark, and also unfair competition, which entitled complainant to an injunction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, §§ 78–88.

Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

In Equity. Motion for preliminary injunction, restraining infringement of trade-mark and unfair competition in trade.

Winter & Winter, for complainant.
Walter H. Chamberlin, for defendant.

RAY, District Judge. On the 25th day of December, 1906, the Concentrated Acetylene Company registered its trade-mark, "Prest-O-Lite," stating it had been continuously used in the business of the corporation since October, 1904, and:

"The class of merchandise to which the trade-mark is appropriated is class 6, chemicals not otherwise classified, and the particular description of goods comprised in said class upon which said trade-mark is used is illuminating gas in portable tanks for supplying automobile headlights, boat

lights, etc. The trade-mark is displayed on the tanks containing the gas by attaching thereto a metallic plate on which the same is shown."

By order of the court, the said company, on due application, changed its name to "Prest-O-Lite Company." Since its organization the complainant company has been extensively engaged in the manufacture and sale of acetylene gas for use on automobiles, which it sells to and distributes to its customers in cylindrical tanks so constructed, the complainant claims, that the maximum amount of gas is delivered in the smallest bulk consistent with safety. Complainant's tanks of special construction and patented are tightly packed with asbestos, which is porous and fireproof, and a certain definite volume of liquid acetone which has the property of absorbing acetylene gas under pressure to an amount many times its volume. The effect is that each tank is filled with this porous asbestos into which has soaked equally throughout the tank a certain definite amount of acetone, and, when the tank is charged with acetylene gas, it is absorbed by the acetone equally all over the tank in amounts proportionate to the heat under which the tank is charged. The result is that, properly packed and charged, there are no spaces within the tank where the gas can collect under pressure and cause combustion. To the side of these tanks, filled with Prest-O-Lite gas, is affixed a removable metallic plate bearing the trademark of complainant, "Prest-O-Lite," with other words, and these in this condition are sold by complainant to the dealers and users, but never without the gas. The metal cylinder itself is not destructible, and can be used for years; but the safety valves and other parts get broken, the asbestos settles, the acetone between depleted, the gas is exhausted after a little time, and empty spaces are left in which the gas under great pressure congregates, or settles, and becomes liable to explode. Hence the asbestos and acetone become a material part of the tank itself, and some skill and judgment is required in refilling and recharging. Each tank is numbered, and complainant company keeps a correct record of the amount of acetone contained in each tank, and, when a tank requires refilling with gas after use, it is possible, and not very difficult, by referring to these records, to properly recharge and refill the tank and restore its maximum efficiency. In the absence of these records, the tanks cannot be so restored to usefulness except by a crude and imperfect method and not, as a rule, to its full efficiency. As a rule it is necessary to recharge or refill a tank after about 40 hours use. In order to facilitate the sale of its acetylene gas, the complainant makes it an invariable practice and a part of its business to take back any of these tanks of its own manufacture when it has become exhausted of gas, or otherwise depleted in its parts, and give in exchange therefor, for a small additional compensation, a Prest-O-Lite tank filed with Prest-O-Lite gas and acetone to the maximum quantity; the tank being newly copper plated with all broken or missing parts restored. Complainant company has also established at large expense pumping plants throughout the country, and numerous agencies, so that a user, without difficulty, can obtain a newly filled and perfect tank in place of his exhausted one.

The engraved plate used by complainant on all its tanks, until about a year ago, read as follows:

Prest-O-Lite
Gas Tank.
Manufactured solely by
The Prest-O-Lite Company, Indianapolis, Indiana.
No. ———.
Exclusive licenses under patents No. 619,552–661,401–664,383–727,609.
Other patents pending.

Each plate has a different number. For about a year past a plate has been attached to these tanks reading as follows:

Prest-O-Lite Gas Tank. No.———.
The Prest-O-Lite Co.
New York—Boston—Indianapolis—San Francisco—Toronto.
Patented Dec. 25th 1900—May 12th 1903.

Notice this device is sold and purchased for sale and use only when charged with gas by the undersigned. No license is granted to use or sell this device when charged by anyone else and no license is granted to anyone else to recharge this device. Any sale or use of this device when sold or used in violation of this condition and limited license will be considered as an infringement of letters patent of the United States under which this device is made and sold and all parties so selling and using this device contrary to the terms of this limited license will be treated as infringers of said letters patent and render themselves liable to suit for injunction and damages without further notice. This license is good so long as this plate remains upon the device. Any erasures or removals of this plate will be considered a violation of the license.

A purchase is an acceptance of these conditions. Agents and dealers are not authorized to vary this license.
The Commercial Acetylene Company. The Prest-O-Lite Company.

It is assumed that any person may make and sell acetylene gas, but each person so making and selling has the right to put it in some particular receptacle, specially stored and all ready for use in a particular place or places, as is done by the complainant here, and when this is done, as here, it becomes something more than mere acetylene gas. "Prest-O-Lite" gas means therefore acetylene gas prepared and tanked as the complainant company prepares and tanks it in these specific tanks. No one has the right to palm off on the public, purchasers, and users, acetylene gas as "Prest-O-Lite" acetylene gas either in these tanks or others. If such gas is sold by others in these tanks, when not prepared or put therein in the careful and particular manner described, the mode, etc., used by complainant company, the impression is given that the gas contained therein is not only acetylene gas, but acetylene gas prepared and put or stored in the tank in the combination, etc., described. If the gas is not so stored therein, and it proves inferior or less efficient in any respect to that sold by the complainant company, when so prepared and placed in the tank, a wrong and injury are done to the complainant. Its gas is brought into disrepute.

The fact remains, however, that when complainant company sells the tank filled with gas, without restriction as to use, such tank becomes the property of the purchaser, and he may use the tank as he sees fit and have it refilled with gas by any one or with something else. This,

however, is a different proposition from the one presented in this case. The defendant company either buys up these old tanks with the plate first described, or trades for them, thus becoming the owner. This it has the right to do. It then fills them in its way with its own acetylene gas, and, in some cases, pasting over a part of the copper plate on the tank a paper label, easily removed, either sells them outright, or gives them to users in exchange for others. This label is sometimes above or below the plate, and sometimes is bottom side up when the tank stands on end. This label reads as follows:

"This tank has been refilled with acetylene gas by the Avery Portable Lighting Company, Milwaukee, Wis., Albany, N. Y., Manufacturers of Autogas Tanks."

The defendant is a competing company in this business and has a tank of its own which it can and does fill with its own gas, described and advertised as "Autogas." Avery, of the defendant company, was formerly with the complainant company, and is familiar with its business methods.

It is evident to me that the defendant pursues this method and gets hold of these "Prest-O-Lite" gas tanks and passes them out to its customers for the purpose of taking trade from the complainant company. It in no way changes the appearance of the tank, except by pasting on the label, easily removed, and which only covers a part of the plate, and when it says, "This tank has been refilled with acetylene gas by the Avery Portable Lighting Company," etc., it implies and fairly represents to the purchaser not only that he is getting acetylene gas made by the Prest-O-Lite Company, but that he is obtaining a properly refilled "Prest-O-Lite gas tank." When the lower part of the plate is not covered by the label, surely the user or purchaser recognizes it as a "Prest-O-Lite gas tank," and will naturally assume that it holds "Prest-O-Lite gas," and this is especially true as the defendant company has a different tank if its own make bearing a different plate and the purchasers will naturally assume that, when they take a "Prest-O-Lite tank," they get Prest-O-Lite acetylene gas properly placed therein, and that when they take an "Autogas tank," they obtain Autogas properly placed therein. The natural result is that would-be purchasers of the Prest-O-Lite gas get Autogas imperfectly placed in the Prest-O-Lite tank. If the purchaser has doubts that he is getting a Prest-O-Lite tank properly filled with Prest-O-Lite gas, he easily scrapes off the label, and, finding the complainant's trade-mark "Prest-O-Lite," he feels assured he has obtained what he desired. I think, and am constrained to hold, that this is an improper use of these tanks bearing complainant's trade-marks, and that these acts constitute unfair competition in trade, and should be restrained. It would be easy and not expensive to remove the engraved plate from the tanks and prevent confusion and imposition. If defendant company would use these tanks, it should do this. I am not passing on the question of infringement of the patents where there has been a violation of the license notice now placed on the copper plates attached to the tanks. I am bound to presume that the patents are valid, but that question is not before me. Complainant's trade-mark is valid, and it is always used on his plate

referred to. To cover the trade-mark with a paper label leaving most of the plate well known to bear complainant's trade-mark, uncovered, informs every one familiar with complainant's goods that it is a Prest-O-Lite tank presumably filled with Prest-O-Lite gas. Purchasers and users are not informed to the contrary. It would be easy to say on the label: "This refilled tank contains acetylene gas made by Avery Lighting Company, and not Prest-O-Lite gas."

I think this case is covered in principle by the following: Pontefact v. Isenberger (C. C.) 106 Fed. 499 (defendant restrained from refilling plaintiff's barrels carrying the trade-mark "Golden Wedding," applied to whisky); Van Hoboken v. Mohns & Kaltenbach (C. C.) 112 Fed. 528 (defendants restrained from refilling with gin, and selling, bottles stamped with plaintiff's monogram trade-mark, firm name, and address); Evans v. Von Laer (C. C.) 32 Fed. 153 (defendant enjoined from selling lime juice in bottles stamped with complainant's name, both parties being dealers in lime juice); Hostetter Co. v. Martinoni (C. C.) 110 Fed. 524 (defendant enjoined from selling bitters in a demijohn marked H. Bitters and in Hostetter Bitters bottles, complainant having exclusive right to name "Hostetter"). See, also, Hostetter Co. v. Sommers (C. C.) 84 Fed. 333, per Townsend, D. J.

I have not gone extensively into the numerous affidavits or the numerous decided cases.

The complainant is entitled to a preliminary injunction restraining the defendant from selling or passing off to its customers or the trade any of these "Prest-O-Lite gas tanks" filled with acetylene gas, unless it shall remove therefrom the metal engraved plate thereon, or completely erase the words and figures thereon, and place on same a plainly printed label stating that it does not contain gas and acetone made by the Prest-O-Lite Company.

So ordered.

---

KENDALL v. LYMAN.

(Circuit Court, D. Massachusetts. March 20, 1908.)

No. 167.

1. CUSTOMS DUTIES—RELIQUIDATION—STATUTE OF LIMITATIONS.

Where a protest that had been filed by an importer had been sustained by the collector of customs and was no longer pending, and more than one year after entry of the importation in dispute the collector reliquidated the entry pursuant to instructions of the Secretary of the Treasury. *Held* that, as a protest had been filed, this action was not in conflict with Act June 22, 1874, c. 391, § 21, 18 Stat. 190 (U. S. Comp. St. 1901, p. 1986), making final the liquidation of duties "after the expiration of one year from the time of entry, in the absence of * * * protest."

2. SAME—PROTEST—DUTY TO TRANSMIT TO GENERAL APPRAISERS.

It is a breach of duty for a collector of customs to refuse to forward to the Board of General Appraisers protests which have been filed under Customs Administrative Act June 10, 1890, c. 407, § 14, 26 Stat. 137 (U. S. Comp. St. 1901, p. 1933); and for this breach the protestant is entitled to damages.

**3. SAME—FAILURE TO FORWARD PROTEST TO GENERAL APPRAISERS—TECHNICAL BREACH OF DUTY.**

> Only nominal damages are recoverable for a breach of the duty of a collector of customs to forward an importer's protest to the Board of General Appraisers, where the breach is technical, and actual damage has not been sustained.

At Law. Action for damages.

This case involves the following statutory provisions:

"Sec. 25. That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the Director of the Mint, and be proclaimed by the Secretary of the Treasury. * * * And the values so proclaimed shall be followed in estimating the value of all foreign merchandise exported to the United States during the quarter for which the value is proclaimed: * * * Provided, that the Secretary of the Treasury may order the reliquidation of any entry at a different value whenever satisfactory evidence shall be produced to him showing that the value in United States currency of the foreign money specified in the invoice was, at the date of certification, at least ten per centum more or less than the value proclaimed during the quarter in which the consular certification occurred." Tariff Act of Aug. 27, 1894, c. 349, 28 Stat. 552 (U. S. Comp. St. 1901, p. 2375).

"Sec. 14. That the decision of the collector as to the rate and amount of duties chargeable upon imported merchandise * * * shall be final and conclusive * * * unless the owner, importer, consignee or agent of such merchandise * * * shall within ten days after * * * liquidation of duties, * * * if dissatisfied with such decision, give notice in writing to the collector, setting forth therein distinctly and specifically * * * the reasons for his objections thereto, and if the merchandise is entered for consumption, shall pay the full amount of the duties. * * * Upon such notice and payment the collector shall transmit the invoice and all the papers and exhibits connected therewith to the board of three general appraisers * * * which board shall examine and decide the case thus submitted. * * *" Customs Administrative Act of 1890, Act June 10, 1890, c. 407, 26 Stat. 137 (U. S. Comp. St. 1901, p. 1933).

"Sec. 21. * * * Whenever duties upon any imported goods, wares and merchandise shall have been liquidated and paid, * * * such settlement of duties shall, after the expiration of one year from the time of entry, in the absence of fraud and in the absence of protest by the owner, importer, agent or consignee, be final and conclusive upon all parties." Act of June 22, 1874, c. 391, 18 Stat. 190 (U. S. Comp. St. 1901, p. 1986).

This action is brought by Frederick Kendall, an importer at the port of Boston, against George H. Lyman, collector of customs at that port. The case relates to imports subject to an ad valorem rate of duty, made from India in 1898, and invoiced in the rupee of that country. In converting the rupee into United States money, the collector computed on the basis of the exchange value of that coin and assessed duty accordingly. The importer protested, contending for assessment on the basis of the pure-metal value.

The collector did not send this protest to the Board of General Appraisers, but on August 21, 1905, acting under instructions from the Secretary of the Treasury, reliquidated the entry on the basis of the pure-metal value, as contended by the importer. He withheld from the importer, however, the refund accruing under this reliquidation, and on November 23, 1905, reliquidated the entry on the basis of the exchange value, thus re-establishing the original assessment.

This step was taken by the collector pursuant to a letter from the Secretary of the Treasury in which it was stated that satisfactory evidence had been produced to the Secretary that at the date of the consular certification of the invoice in question the value of the Indian rupee in United States currency exceeded by more than 10 per cent. the value estimated and proclaimed for

the quarter in which the consular certification occurred. This action of the Secretary was taken on the authority of section 25, supra.

The importer duly protested against this final liquidation, contending (1) that it was illegal under section 21, supra, because made more than one year after entry, and (2) that the Secretary of the Treasury had exceeded his powers in ordering it. The plaintiff requested the defendant to forward said protest to the Board of General Appraisers for their decision; but the defendant, acting under instructions from the Secretary, declined to do so.

The ground of the present action, as stated in the importer's brief, is substantially that the collector refused to obey the command of section 14, supra, that protests should be forwarded to the Board of General Appraisers, under which the importer had a right to have his case decided by the board, and that the collector in thus disobeying such command violated a duty that he owed to the importer, and became liable to him for all damages sustained thereby; that is, the amount of the refund which the importer would have been entitled to recover from the United States.

Whipple, Sears & Ogden, for importer.
William H. Garland, Asst. U. S. Atty.