## THE VALENCIA.

(District Court, D. Washington, N. D. July 26, 1901.)

1. CARRIERS—STEAMSHIP—OVERCROWDING PASSENGERS—DAMAGES.

Where a steamship company having accommodation for and authorized to carry only 375 steerage passengers sells tickets to and receives 475 such passengers, and by reason of such overcrowding the passengers are delayed and injured, the company is responsible for such damage, since such crowding beyond the point at which the passengers could be safely carried is a breach of the contract to safely carry them.

2. SAME—INSPECTOR'S CERTIFICATE—EVIDENCE.

An indorsement on an inspector's certificate that a steamship had been provided with accommodations for additional passengers should be rejected as evidence of the fact that such accommodations had been provided, when all the testimony shows conclusively that there were no such accommodations on the ship.

3. SAME—DEFENSE.

When permission of inspector was obtained to crowd a vessel beyond the limit of accommodation provided for passengers, such permission is not a defense to an action for damages to passengers sustained by reason of such overcrowding.

4. SAME—CONTRACT—LANDING—PUBLIC POLICY.

A provision in a contract between a ship and its passengers that the landing shall not be deemed a part of the voyage is contrary to public policy and void, and does not relieve the carrier from liability for loss of baggage or delay in delivery.

P. P. Carroll, for libelants.
Gorham & Gorham, for claimant.

HANFORD, District Judge. The libelants and interveners are waging these suits to recover damages for breach of contracts for the transportation of themselves, their baggage and freight, on board the steamship Valencia from San Francisco to Nome, in the year 1900. For convenience and brevity, they will all be referred to in this opinion as libelants. The grounds of complaint are lack of sufficient accommodations on the ship for transportation comfortably of the number of second-class passengers who were received on board and made the voyage; lack of ventilation in the compartments in which the sleeping berths of the second-class passengers were located, and in which their meals were served; neglect to keep said compartments clean; lack of a sufficient number of water-closets, and the filthy condition in which those used by second-class passengers were suffered to remain; bad cooking and slovenliness in serving the food, and failure to supply second-class passengers with sufficient wholesome food and with sufficient drinking water; incivility on the part of the officers and crew of the vessel towards the second-class passengers; unreasonable delay in delivering the baggage and freight belonging to the libelants on arrival at the terminus of the voyage, in consequence of which they were without the use of tents and other conveniences for comfortable living, and were exposed day and night to the elements, and obliged to incur additional expense, and were made sick.

From the pleadings and evidence I find that each of the libelants purchased a ticket at San Francisco entitling him to travel second-

class on the Valencia to Cape Nome, and paid therefor $75. The words "second-class" are printed in bold type on each ticket, and each of the libelants understood at the time of entering into his contract that he was securing second-class accommodations, but they did not understand second-class to be the same as steerage, or expect to be treated as steerage passengers. Some of the tickets were sold to them by ticket brokers who persuaded them to take passage on the Valencia by the arts usually employed by solicitors and hustlers, assuring them that they would be assigned good berths, have the liberty of the ship, and that they would be fed as well as the first-cabin passengers, except that they would not be permitted to eat at the same time. The Valencia was well equipped for the voyage, so far as being furnished with everything needful for her navigation, and she had on board an abundance of good provisions and good water. Her officers, including the captain and steward, were men of experience and in every way competent, and excellent discipline was maintained throughout the entire voyage. There was no incivility shown to the passengers, unless in a few instances by petty officers or servants. A considerable part of the testimony is disgusting, and I am convinced that the libelants and their witnesses have grossly exaggerated in matters of detail. Their testimony with reference to some of the important and material facts is necessarily and obviously false. I will refer to one matter only, as a sample. They have given positive testimony that all of the closets were kept locked and reserved for officers and employés of the ship, except two, and that these two, to which several hundred passengers were obliged to resort, were constantly filthy. The evidence to the contrary is convincing, and I do not believe that such a condition could possibly have continued during the time required for the voyage. The indisputable evidence, however, makes it clear to my mind that these passengers did suffer great discomfort, the cooking was undoubtedly bad, and they did suffer for want of palatable food, and they were so crowded in the quarters in which they all had to sleep, and in which their meals were served, that they must have greatly annoyed each other, and undoubtedly by their own irritableness aggravated the general discomfort. These compartments were below the main deck, and their discomfort was further aggravated by a large number of horses carried on the same voyage, stabled on the fore part of the main deck, over the quarters of these passengers. In my opinion, these conditions constitute a violation of the implied agreement on the part of the carrier to provide reasonably commodious accommodations for the number of passengers engaged to be carried, and to not subject the passengers to such treatment as all men must condemn as inhuman. The certificate of inspection shows that this ship was provided with accommodations for and was authorized to carry 128 first-cabin passengers and 375 steerage passengers. On the voyage referred to all of the passengers who purchased second-class tickets were treated as steerage passengers, and the number carried was 475; that is, 100 in excess of the number for which accommodations existed according to the certificate of inspection. The claimant, having succeeded, with the help of ticket brokers whom it author-

ized to sell tickets for a commission, in securing passengers in excess of the number authorized by her certificate of inspection, was evidently unwilling to forego such an opportunity to increase the profits of the voyage, and therefore obtained from the inspectors at San Francisco permission to carry an increased number of passengers. The certificate bears an indorsement, made on the face of it, and signed by the inspectors, to the effect that the Valencia had provided accommodations for and was authorized to carry 99 second-cabin passengers. This indorsement must be rejected as evidence of the fact that accommodation for the additional passengers had been provided, because all the testimony in the case proves conclusively that the Valencia did not have accommodations for any second-cabin passengers. The steamer came into Seattle on her way north, and, finding a crowd here waiting for transportation to Nome, made some additions to her total earnings by taking on still other passengers to the full limit allowed by the inspectors, and the testimony shows that the local inspectors at Seattle increased the limit up to 615. The scheme of obtaining official permission to crowd the ship beyond the limit of accommodations provided for passengers may be a protection against any prosecution for the statutory penalty prescribed for excessive overloading of passenger ships, but it is not a ground of defense in a suit like this, to recover damages for injuries to passengers resulting from overcrowding.

The libelants went to Nome as gold seekers, and each of them took along something in the way of an outfit, including tents, tools, and such supplies and necessaries as would enable him to work placer mining claims and live in a new mining district. These outfits were carried as baggage under a stipulation stamped on their tickets, entitling each man to have 250 pounds of baggage. Some of them had machinery and implements, which were shipped as freight. There are no wharves at Nome, and the passengers, their baggage and freight, had to be landed by the use of lighters; and owing to the great rush in the season of 1900, and the lack of a sufficient number of lighters, and rough water, there was considerable delay in landing all the baggage and freight which belonged to the libelants. I believe that the officers and crew of the Valencia did the best they could, under the conditions existing at Nome, to discharge the ship promptly; but the conditions were made worse by the overcrowded condition of the ship, and most of these libelants suffered great privations and were subjected to losses by reason of the delay, which might have been unnecessary if the ship had not been unnecessarily overloaded. In this case the carrier has attempted to secure exemption from liability by stipulations in its contracts that the landing shall not be deemed part of the voyage. But landing is necessarily a part of the contract for transportation; and such stipulations, whether expressly assented to or not by passengers and shippers, are void, because it is contrary to public policy to permit owners of ships to carry people to remote places without providing efficient means for delivering them at their places of destination, with their belongings. The proposition that passengers might be sent ashore in a place like Cape Nome, with the conditions existing there

in the early part of the season of 1900, and all their outfits retained on board of the ship, is too shocking to be admitted as a defense by any court of justice.

Some of the libelants have failed to introduce any evidence to prove their allegations as to particular damage. The court, therefore, can do no more than decree that they recover the amount paid for their tickets, with interest. The evidence introduced in behalf of others is sufficient to create a belief in my mind that they suffered in consequence of the conditions I have described, and were made sick, and lost opportunities for employment, and were compelled to incur increased expenses, which would have been unnecessary if the carrier had fulfilled its contracts with them. I therefore direct that a decree be entered in favor of each of the libelants as follows: John T. Grismore, for $500; Isaac R. Birt, for $500; Francis M. White, for $500; A. C. Porterfield, for $300; Charles Scott, whose true name is Charles Weldon, $250; Richard L. Lewis, for $250; and to George C. Grismore, George Sandmann, J. L. Kizsee, Frank J. Murphy, James L. Morris, each $75, with interest at 7 per cent. from the 1st day of July, 1900,—the several sums awarded being, in my opinion, reasonable compensation for personal discomfort, extra expenses, losses of baggage and freight, and consequential losses on account of delay in delivering their baggage and freight; and in fixing the amount of the damages I have made due allowance for exaggerations in the evidence, for contributory negligence on the part of the libelants, and for unnecessary expense to the claimant in defending the ship, on account of claims for excessive damages.