THE LINSEED KING.

Petition of SPENCER KELLOGG & SONS, Inc.

District Court, S. D. New York. March 15, 1928.

1. Shipping ⊸209(3)—Claimants against ship have burden to establish liability, while burden is on shipowner, petitioning for exemption of liability, to show ignorance of facts on which liability is based (admiralty rules 54, 56 [set under 28 USCA § 723]; 46 USCA § 183).

In proceeding by owner of ship for limitation of liability under admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St. §.1536), and R. S. § 4283 (46 USCA § 183; Comp. St. § 8021), in which claims are asserted, burden of proof rests on claimants to establish liability, while burden is on petitioner seeking exemption to show that accident to ship was without privity or knowledge of facts on which liability is based.

2. Shipping ⊸166(1)—Boat must be seaworthy, whether private or common carrier, or carrying merchandise or passengers.

Seaworthy boat must be used, irrespective of whether boat is used as private or common carrier, or whether cargo consists of merchandise or passengers.

3. Shipping ⊸166(1)—Vessel's owners must exercise reasonable care in her construction to avoid injury to passengers, and high degree of precaution is necessary to avoid dangers from contact with ice.

Vessel's owners are required to exercise reasonable care in her construction and equipment to avoid injury to passengers, regardless of vessel's strength or size, or purpose for which she was navigated, and high degree of precaution is necessary to avoid dangers from contact with ice.

4. Shipping ⊸209(3)—In proceedings for limitation of liability resulting from accident to launch striking ice floe, claimants were required to show launch was unseaworthy for purpose for which she was used (admiralty rules 54, 56; [set out under 28 USCA § 723] 46 USCA § 183).

In proceedings by shipowner, under admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St. § 1536), and R. S. § 4283 (46 USCA § 183; Comp. St. § 8021), for limitation of liability on account of accident to gasoline launch from striking ice while crossing river in winter, claimants were required to show that the launch was unseaworthy for the particular purpose for which she was to be used at that time.

5. Shipping ⊸166(1)—Manager of plant, who had workmen conveyed across river in launch, should have anticipated danger from ice floes, in view of weather conditions.

Manager of plant, who had workmen conveyed across river by a launch, was required in exercise of diligence and reasonable care to anticipate danger in winter from existence of ice floes, in view of weather conditions, and should have warned pilot of peril.

6. Shipping ⊸166(1)—Vessel must be fit to carry passengers freed from anticipated perils.

Mere seaworthiness of vessel in ordinary weather and conditions is not the sole factor in determining its fitness, but vessel must be fit to carry passengers freed from anticipated perils.

7. Ferries ⊸32—Ferrying in winter requires exercise of utmost care to protect passengers.

Ferrying in winter, when ice fields are to be expected, requires on part of owner's responsible agents, charged with navigating boat, utmost care to afford protection to passengers.

8. Shipping ⊸208—Corporation owning launch held negligent in accident resulting from striking floating ice, in permitting use of launch under weather conditions known to managing agent (46 USCA § 183; admiralty rules 54, 56 [set out under 28 USCA § 723]).

In proceedings by corporate owner of gasoline launch for limitation of liability under ad-

miralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St. § 1536), and Rev. St. § 4283 (46 USCA § 183; Comp. St. § 8021), in connection with accident causing considerable loss of life when launch crossing river struck piece of floating ice with such force that her port bow was stoven in, owner was guilty of negligence in using launch for convenience of its workmen, in view of weather conditions known to managing agent.

**9.‾ Shipping ☞208—Privity or knowledge of officers of corporation owning vessel is‾ knowledge and privity of owner (admiralty rules 54, 56. [set out under 28 USCA § 723]; 46 USCA § 183).**

Privity or knowledge of officers of corporation owning vessel or their managing agent is the knowledge and privity of the owner in proceedings for limitation of liability, under admiralty rules 54 and 56 (set out under 28 USCA §·723; Comp. St. § 1536), and Rev. St. § 4283 (46 USCA § 183; Comp. St. § 8021).

**10. Shipping ☞208—Knowledge or privity imputable to owner of vessel of overcrowded condition estops exemption from liability (46 USCA § 183; admiralty rules 54, 56 [set out under 28‾ USCA § 723]).**

Vessel may become unseaworthy and unfit for use because of overcrowded condition, and knowledge or privity imputable to owner of such condition estops it from claiming exemption from liability, under Rev. St. § 4283 (46 USCA § 183; Comp. St. § 8021), and admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St.,. § 1536).

**Ⅰ‖. Shipping ☞208—Overcrowding of launch, knowledge of which was chargeable to owner, where it caused loss of additional life in accident, alone prevented limitation of liability (46 USCA § 183; admiralty rules 54, 56 [set out under 28 USCA § 723; Comp. St. § 1536]).**

Where overcrowding of cabin in gasoline launch was act of negligence which contributed to drowning of some of men on board when port bow of boat was stoven in after striking floating ice, overcrowding, though not proximate cause of accident, was a concurrent, cause which prevented owner's limitation of liability, under Rev. St. § 4283 (46 USCA § 183; Comp. St. §· 8021); and admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp.· St. § 1536), where knowledge was imputable to it.

**12. Shipping ☞207—License permitting operation of gasoline launch with crew of one did not relieve owner from liability, where overcrowding made larger crew ·necessary (46 USCA § 183; admiralty rules 54, 56 [set out under 28 USCA § 723]).**

License issued by Bureau of Navigation, stating number of crew on gasoline launch, was one *held,* not to operate to exonerate owner from blame˙ for insufficiency of crew, in ,proceedings for limitation of liability under Rev. St. § 4283 (46 USCA § 183; Comp. St. § 8021), and admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St. § 1536), where larger crew was made necessary by reason of overcrowding of cabin.

**13. Shipping ☞209(1⅛)—Court, having denied petition for limitation of liability, retained case for purpose of passing on claims (46 USCA § 183; admiralty rules 54, 56 [set out under 28 USCA § 723]).**

In proceeding by owner of gasoline launch for limitation of liability under Rev. St. § 4283 (46 USCA § 183; Comp.· St. § 8021), and admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St. § 1536), in which petition for such limitation was denied, proceeding was continued in admiralty court for purpose of passing on rights of claimants filing claims, being transferred to special commissioner, where further testimony was necessary.

**14. Shipping ☞204—Gasoline launch, used to transport workmen across river, held "vessel," in proceedings for limitation of liability (46 USCA § 183; admiralty rules 54, 56 [set out under 28 USCA § 723]).**

Gasoline launch, used to transport workmen across river to plant of owner seeking limitation of liability under Rev. St. § 4283 (46 USCA § 183; Comp. St. § 8021), and admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St. § 1536), *held,* "vessel" within meaning of act.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Vessel.]

**15. Shipping ☞208—Corporation owning gasoline launch held not entitled to limitation of liability resulting when bow was stoven in from striking ice floe, where weather conditions, overcrowding of boat, and insufficiency of crew were known to managing agent (admiralty rules 54, 56 [set out under 28 USCA § 723]; 46 USCA § 183).**

Corporation owning gasoline launch, which used it for transportation of workmen across river to its plant, *held,* not entitled to limitation of liability under admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St. § 1536), and Rev. St. § 4283 (46 USCA § 183; Comp.· St. § 8021), for loss of life and injuries resulting when port bow was stoven in by reason of launch's striking floating ice, where corporation, through its manager, was chargeable with notice of weather conditions rendering boat unsafe, and where overcrowding was known and crew was insufficient under those conditions.

In Admiralty. Proceeding by Spencer Kellogg & Sons, Inc., as owner of the motorboat Linseed King, her engines, etc., for limitation of liability, in which claims were asserted. Limitation of liability denied, and interlocutory decree ordered.

Bigham, Englar & Jones, of New York City (D. Roger Englar, L. J. Matteson, O. D. Duncan, Chauncey I. Clark, Henry Dieck, Jr., Charles W. Hagen, and Stanley R. Wright, all of New York City, of counsel), for petitioner.

Silas Blake Axtell, of New York City .(Elizabeth Robinson, of New York City, of counsel), for claimants.

Lester Hand Jayne, of New York City

(Arthur L. Obre, of New York City, of counsel), for claimants Roberts, Sims, McEachin, and Varouaxski.

Kurzman & Frank, of New York City (Samuel B. Seidel, of New York City, of counsel), for claimant Ifill.

Marsh, Spencer & Marsh, of New York City (C. C. Marsh and R. T. Marsh, both of New York City, of counsel), for claimant Navas.

Oeland & Kuhn, of New York City (Edward J. A. Rook, of New York City, of counsel), for claimant Hicks.

HAZEL, District Judge. This is a proceeding for limitation of liability of the sole owner, Spencer Kellogg & Sons, Inc., of the gasoline launch Linseed King, under admiralty rules 54 and 56 (set out under 28 USCA § 723; Comp. St. § 1536), and section 4283, R. S. (46 USCA § 183; Comp. St. § 8021).

On December 20, 1926, at about 6:10 o'clock in the morning, a gasoline launch with an inclosed cabin, known as the Linseed King, left Edgewater, N. J., in charge of her pilot and operator, Rohweder, to cross the Hudson river to the Ninety-Fifth Street pier, Manhattan, a distance of about 1.35 miles or 7,140 feet, on a customary trip (somewhat earlier than the regular morning trips) to take aboard workmen as passengers and convey them to petitioner's plant at Edgewater. Some of the passengers were regular employees, while the others were applicants for temporary employment as laborers to unload a linseed ship which had arrived at petitioner's dock, and who assembled at the pier at the request of petitioner appearing in advertisements in the New York World. The wind at the time of departure from the Jersey side was southwest, with a tide about to turn. It was dark. The running lights of the boat were lighted. There was no ice perceived by the pilot on the Jersey side, but near the New York shore of the river there was ice through which the launch passed to the pier. Men, waiting, hastily boarded the launch, as many as possible, 38 in all, seating themselves on the long seats in the cabin, one seat on each side, while the others stood in the aisle, none remaining outside of the cabin. The exact number of men who boarded the boat is in dispute. A number remained behind on the pier, intending to cross over on the succeeding trip. Petitioner claims the number boarding the boat did not exceed 75, while claimants say that fully 86 crowded into the cabin. The boat started back promptly at 6:30 o'clock. It was still dark.

24 F.(2d)—61½

The river in the vicinity of the pier, extending out about 500 feet, contained floating ice in pieces of various sizes, through which the boat moved at slow speed, the ice scraping and bumping her. Upon reaching a short distance beyond midstream, the launch, running in clear water at a speed not exceeding 7 or 8 miles per hour, struck a heavy floating object—no doubt an ice floe—with such force that her port bow was stoven in, the opening being approximately 19 inches long and 8¾ inches wide. "What followed was indeed a most appalling occurrence. The water poured in rapidly, the motor was stopped, windows were shattered, a panic ensued, and the Linseed King sank in about two minutes. About 29 survivors saved themselves by clinging to the launch, some standing on her deck, others leaping into the river and swimming to ice cakes which supported them until they were rescued. Many of the saved suffered severely from exposure. The remainder, unable to leave the inclosed cabin, were drowned. Most of the bodies (27 in number), when the boat was raised, were taken from the cabin, 8 from the river, and 23 bodies, claimants contend, were not recovered." Much testimony has been taken on both sides, comprising 2,213 typewritten pages; 119 witnesses testified, and many exhibits were introduced in evidence.

The Linseed King was licensed as a vessel under 20 tons by the Department of Commerce on April 15, 1922. Her gross tonnage was 10.75, net tonnage 7, length over all 45 feet, breadth 10 feet, and depth 4 feet 6 inches. (The license erroneously states length 42.25 feet, depth 4 feet.) She was used as a ferry, navigating between petitioner's plant and the pier already mentioned, and transporting employees across the river who lived in New York. She was originally constructed in 1919 of cedar planking, as an open launch. Her length was 35 feet, beam 10 feet; but in 1922, 10 feet were added to her length. Although in daily and nightly use, for ferrying workmen to and from the plant, she had encountered no other mishaps. In her earlier construction she was provided with a canvas cabin, curtained at the sides with glass windows, which buttoned at the bottom, and in March, 1925, a pilot house was constructed forward of the cabin, the floor being a few inches below the level of the main deck and 2½ feet higher than the cabin deck. There was no partition between the cabin and the pilot house, merely a pipe rail extending partly across, behind the wheelsman. At the after end there were on each side two doors 22 inches wide, at the top of a few steps

leading from the cabin deck. The length of the cabin was 29½ feet, aside from the pilot house of 4 feet, and, after deducting the space of the seats on both sides, there remained an aisle about 5½ feet wide, or, as Barrett testified, 63 square feet and a small margin for the men, who were not seated, to stand in. There was also a companionway 29 inches wide at the rear of the cabin, which had a hatch over the top and a two-section door hinged at the sides—a few steps leading thereto on the inside. The forward door opened outwardly, while the rear door opened inwardly.

In the latter part of 1926, nine glass windows on each side, like those in a street or railway car, though having somewhat smaller openings, were substituted for the canvas curtains. Two forward windows and two windows aft on each side were hinged at the bottom, while the side windows, in the middle at the top, had a brass chain 14 inches long secured to the upper end of the sash by a light staple, which allowed the windows to partly open inwardly for ventilation. It was not difficult to remove the staples to enable taking out the windows which were 15 inches by 22 inches, 4 feet above the level of the deck, if any one for any reason, under ordinary circumstances, desired to do so. She had no bulkhead or buoyancy tank, and the strip of metal sheathing 1½ inches thick was used solely to protect her from wear and tear. There were aboard about 83 life preservers and three life rings, held by battens on the ceiling, and besides two piles of life preservers were kept at the ends of the long cabin seats close to the rear door.

The exhibit photographs disclose lengthwise breaks, cuts and chafes on the starboard side of the boat, and puncturing of the port bow. When she was cut and chafed on her starboard side does not definitely appear. Both breaks, no doubt, were caused by going through ice floes and by impact; but the witnesses agree that the hole on her port bow, through which volumes of water came into the boat, caused her to founder. Since she did not transport passengers for hire, she was not subject to regulation by the United States local inspectors, aside from the requirement (Motor Act of 1910 [46 USCA §§ 511–519; Comp. St. §§ 8277–8281, 8283–8286]) that life preservers be carried for every person on board. In its brief, petitioner stated that it does not attempt to shield itself because of any inapplicability of any existing law, but asserts that the Linseed King, in general strength, fitness, and seaworthiness, compared with boats duly licensed to carry passengers for hire on the river; that she operated as a ferry, and was therefore not limited by statute as to the number of persons carried. R. S. 4464 (46 USCA § 451; Comp. St. § 8228). The value of the craft was negligible.

The two paramount questions presented are (1) whether claimants, who were cited to appear and answer, have proven any negligence or breach of duty in operation, management, and maintenance of the Linseed King; and (2) if so, has her owner proven that such negligence or breach of duty was without knowledge or privity on its part. These questions will now be discussed.

[1] The burden of proof rests upon claimants to establish liability, while the onus probandi is on the petitioner for exemption of liability, to show that it was without privity of knowledge of the facts upon which liability is based. The John H. Starin (C. C. A.) 191 F. 800; Scow 84–H (C. C. A.) 296 F. 427.

By their answer claimants deny any right to limit liability. It is affirmatively alleged that the Linseed King was unseaworthy for the particular purpose for which she was used; that she was not properly equipped for the trip, in view of the ice in the river, or for a time when ice might be expected therein; that she was operated without a license, in violation of the steamboat inspection law; and, moreover, that her owner permitted her to be overloaded with human beings, thus endangering their lives.

[2-4] No difference exists, as to unseaworthiness, between private and common carriers, or as to whether a cargo consists of merchandise or passengers, since, in each instance, a seaworthy boat must be used. The Linseed King must have been fit to carry her passengers for the particular transportation; for, if she lacked reasonable fitness, staunchness, and sufficiency, she was unseaworthy. It was truly said that contact with an ice floe, berg, or cake in the winter season in the Hudson river was not due to an inevitable accident. Regardless of the vessel's strength and size, or the purpose for which she was navigated, she was required to exercise reasonable care in construction and equipment to avoid injury to her passengers. A high degree of care and precaution was necessary in her navigation to avoid dangers from contact with ice. The rule is that reasonable fitness or seaworthiness of a vessel must be tested, as said in The Benjamin Noble (C. C. A.) 244 F. 95, by the facts and circumstances of each particular case, and her capacity and tonnage of her cargo may be vital factors.

Hence claimants herein must show that, at the beginning of the return trip, the Linseed King was unseaworthy for the particular purpose for which she was used.

Her asserted unseaworthiness is based on various incidental items of testimony; but, summarizing it, I find that it is not satisfactorily shown that she was unsuitable for carrying passengers in general, or that she must be condemned for unfitness as to the several items to which reference is now made. She was strongly built, and, although not provided with tight bulkheads, the testimony of local inspectors and experienced witnesses proves that few gasoline motorboats, carrying passengers in river transportation for hire, are so provided. She was without metal sheathing; but I find that sheathing is ordinarily applied to boats of her type for preservation, and not for protection from impacts. She was not designed to carry the workmen amid broken ice, or when ice appeared in the river, and therefore a steel shoe covering her stem was not required. She did not leak, and was not subject to leaking more than wooden boats ordinarily leak, and her buoyancy and stability under ordinary conditions were adequate. She was admittedly under the control, at the time of the mishap, of an experienced motorboat pilot, whose skill and experience was the subject of inquiry, and was tested before his employment by responsible agents of petitioner. He alone was in charge at the time of the mishap. Her certificate of registration required a crew of one man; but, as to this phase, I will comment later on. The alteration of her tonnage after substitution of wooden window frames for canvas curtains did not materially increase her burden, and therefore I think this point may be passed without definite decision. See The Messenger (C. C. A.) 168 F. 908.

Testimony suggesting a defectiveness of the clutch is not regarded as substantial, for Rohweder and Balz, superintendent of transportation, swore that it worked properly prior to the catastrophe. The undisputed evidence of various witnesses, including Rohweder, Stover, the works manager, and Balz, shows that instructions were given her operators that running her when there was ice was forbidden, and she would be laid up, when ice appeared, until spring. Rohweder also testified that Balz was his immediate superior, and he was told by him and by Stover, the manager of the plant, not to run when ice appeared, in heavy fog, or in stormy weather, and, moreover, not to carry any more men than there were life preservers.

Stover had received such instructions from Aldrich, the secretary of petitioner.

Considerable testimony on both sides was given as to whether there was ice in the river before the day of the mishap, and it becomes important to inquire and determine whether the Linseed King was in fact negligently permitted to run after its appearance, and at a time when its appearance reasonably might be anticipated, and perils guarded against by abandonment of the trips. Ordinarily, ice in the winter months, forming in the Hudson river on the flats near Tarrytown and points above, is broken up by the wind, temperature, and the tide, and is generally broken up at ebb tide. It then runs down the river in large floes or cakes, usually averaging two miles an hour, and later part of it, at the last of the ebb tide and first of the flood, floats back upstream. See testimony of Smith, page 1362, record. That there was ice in the Hudson river on the day before the disaster, and prior thereto, is shown by numerous creditable witnesses. It will suffice to refer to a few. The witness Lang, formerly night operator of the launch, in his deposition states that he saw light ice below Ninety-Fifth street on his two Sunday morning trips, the day preceding the accident, but he made no report of it to his superiors, since it did not interfere with his operations; while Cooper, one of the regular workmen, says that on his trips to the plant on Saturday he saw plenty of ice in the river on the New York side, and a little ice on Sunday. That there was freezing temperature, as low as 11 degrees, at various times beginning December 2d, and continuing to the 7th, followed by warmer to the day of the mishap, appears by the weather reports in evidence; while Captain Kearney testified that he saw ice in the river a week prior to December 20th. Oliver, superintendent of the Cornell Steamboat Company, testified that he encountered difficulty with ice in towing on December 4th. Smith, pilot of the fireboat Mitchell, testified that there was ice in the slip, well churned up from drifting down the river, two or three days before the accident. Policemen Lennon and O'Toole, patrolling the locality of Pier 95, both declared that they saw ice floes a week previous to the accident, while Quinn showed log entries of ice a few miles above Edgewater on December 18th, and Cook, manager of Dyckman street ferry, and Peterson saw ice two or three days before the occurrence. Pollard, dock master, swore that he saw ice in the river on the New York side at time prior to the accident.

[5-7] In the light of such testimony, it is

indeed to be wondered why Stover, Rohweder, and Balz did not foresee that it was perilous to continue the trips. Rohweder was negligent, in my opinion, in taking passengers on board, knowing that he would have to pass through ice before reaching the clear, and that doing so was fraught with danger. Stover and Balz knew, or should have known, of the ice fluctuations in the river, due to wind, current, and tides. And the fact that the launch was not regarded by her owner as seaworthy to withstand ice conditions may be assumed from the instructions that had been given to cease her trips on its appearance. The probability of ice appearing, in view of the temperature, should have prompted direct instructions to abandon the trips. It is not enough to say that Stover had no knowledge of the appearance of ice in the river, that he scanned the river and saw none, or that it was mush ice, or that he was not informed by Lang that he had encountered ice on his two trips, or that he was unaware of ice on other days prior to the accident. The conditions of the weather were known to him and should have been taken into account (Texas & Gulf-S. S. Co. v. Parker [C. C. A.] 263 F. 864), and should have warned him of the danger. It was a danger that should have been anticipated by the exercise of diligence and reasonable care. The Jean Bart (D. C.) 197 F. 1002; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65.

The credibility of the witnesses testifying to the presence of ice is not successfully challenged. They have no interest in the outcome of the litigation, and their recollection of their observations is to be given greater weight than that of those who say that they did not see any ice. Seaworthiness, as well said in The Benjamin Noble, supra, is a relative term, and involves inquiry into the conditions under which a vessel is used, together with her capacity in connection with the nature or tonnage of the cargo. Mere seaworthiness in ordinary weather and conditions is manifestly not the sole factor in estimating a vessel's fitness. She must be fit to carry her passengers, freed from anticipated perils, and ferrying in winter, when ice fields are to be expected, not only involved terrible loss of lives, as the result shows, but required, on the part of the owner's responsible agents, the exercise of the utmost care to afford protection. The situation is not similar to an ocean steamship speeding in a fog, as was the case in LaBourgogne, 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed.

973. There it was ruled by the Supreme Court that speed in a fog could not be determined by set rules and must largely be left to the discretion of the master and her officers.

[8, 9] It is different as to the appearance of ice in the Hudson river where a duty rested upon the manager of the corporation, under whose supervision the boat was operated, to guard against ice perils and generally such dangers as were apt to arise in the usual course of her short ferrying trips. The Virginia (D. C.) 264 F. 986, affirmed Hines v. Butler (C. C. A.) 278 F. 877. Both Stover and Balz were in constant communication with her movements. They could not silently allow her operator to use his sole discretion in continuing his runs when they knew, or should have known, that the boat's safety was menaced. They could not supinely rest upon verbal instructions previously given him to lay up the boat, for Rohweder, who spoke to Stover about ice conditions, swears that they (Stover and Johannis) were to decide when the ice conditions became such that the boat was to be laid up. Stover knew she was not built to withstand impacts from heavy ice, and, knowing these things, he ignored the weather reports, made no inquiries of Lang, or of any one. There was negligence in using her under such conditions when her return trip started. Her owner has not proven that it was without privity and knowledge within the meaning of section 4283 of the Revised Statutes, as it has been construed and interpreted. Eastern S. S. Corp. v. Great Lakes D. & D. Co. (C. C. A.) 256 F. 497; Texas & Gulf S. S. Co. v. Parker, supra; the Virginia (D. C.) 264 F. 986, affirmed (C. C. A.) 278 F. 877, certiorari denied 257 U. S. 659, 42 S. Ct. 185, 66 L. Ed. 421; Parsons v. Empire T. Co. (C. C. A.) 111 F. 202. It is uniformly ruled that privity or knowledge of the officers of a corporation or their managing agent, is the knowledge and privity of the owner. The Republic (C. C. A.) 61 F. 109. See, also, In re Sanford Ross, Inc. (C. C. A.) 204 F. 248; In re Jeremiah Smith (C. C. A.) 193 F. 395; The Teddy (D. C.) 226 F. 498.

[10, 11] There was another act of negligence, contributory, no doubt, to the loss sustained, namely, the large number of passengers who were permitted to board the boat and enter the cabin, the only place (there being no outside deck space) where they could be. It may be assumed that it was believed that the Linseed King had the right to carry as many persons as she had

life preservers, and at times she, no doubt, carried that many. The evidence preponderatingly shows that fully 75, perhaps a few more, boarded the Linseed King. Sixty-eight have been accounted for, and petitioner concedes that there may have been 70. Claimants insist, as already pointed out, that about 24 bodies were not recovered, and that it may fairly be inferred that a total of 87 were crowded into the cabin. However, the testimony as to the larger number is somewhat conjectural, and I think a conservative total number, based on evidence and the probabilities, was approximately 78. When it is considered that many of the men wore overcoats or heavier clothing than is ordinarily worn at other seasons of the year, it is fairly inferable that the persons seated were close together, while those who were in the aisle were uncomfortably crowded to such an extent that there was difficulty in leaving the cabin by either door. The evidence justifies the conclusion that the men, in their extremity, were unable to use life preservers and leave either by the doors or windows.

Permitting the overcrowding of the cabin was an act of negligence and must be condemned, and, if it was with the knowledge and privity of the corporation or the manager of its plant, the right to limit liability must be denied. See The Valencia (D. C.) 110 F. 221, and The Annie L. Vansciver (D. C.) 161 F. 640. In the last-mentioned case, the shipowner was permitted by the local steamboat inspector to crowd the vessel beyond her capacity, and the court ruled that, as the owner had knowledge that the vessel was habitually overcrowded and that there was likelihood of dangers to passengers, it could not escape liability for failure to make adequate provision for preventing too many persons from coming aboard. That a vessel may become unseaworthy and unfit for use because of her overcrowded condition has many times been decided, and knowledge or privity, imputable to the owner, estops exemption from liability under the statute. Weisshaar v. Kimball (C. C. A.) 128 F. 397, 65 L. R. A. 84; The Benjamin Noble, supra, affirmed (C. C. A.) 244 F. 95. And see Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631. While overcrowding was not the proximate cause of the disaster, it nevertheless was contributory to the drowning of at least some of the men in the cabin, for no one will doubt that, if the boat had not been overcrowded, quite a number, how many of course is uncertain, would not have gone

down with the foundered boat It was a concurrent cause, and the owner, in my opinion, was not absolved from liability, even though not responsible for other causes. Wilmington, etc. v. Fulton, 205 U. S. 75, 27 S. Ct. 412, 51 L. Ed. 708; Delaware, etc. v. Petrowsky (C. C. A.) 250 F. 565.

Petitioner's experts, in opposition to overcrowding, base their opinion on mathematical calculations, testified that the boat could conveniently carry 80 to 90 persons, allotting to each person 1.88 square feet of floor space on a basis of 82 persons inside the cabin, while each man would have 2 square feet of floor space on a basis of 75 passengers, and accordingly it is contended that she was not overcrowded, even though she contained a number of men at least equal to the number of life preservers carried by her. Claimants' experts, in their calculations, reached a contrary conclusion. However, I disregard the expert testimony on this point and give credence to the unimpeached evidence of many survivors. They substantially testified that the men in the cabin were crowded or jammed so closely together that there was interference with their movements. Such testimony is entitled to greater weight than testimony based on computation and calculation of available area or space, especially when it is corroborated by other facts and circumstances, namely, by evidence that men were standing on the steps of the pilot house near the front passageway and close around the engine. In this connection it was also proven by custom house records that motorboats, navigating on the river under government regulation, are given a carrying capacity of 40 passengers on boats 41 to 45 feet in length, gross tonnage 15 to 26, and, in a few instances, 67, with a corresponding number of life preservers, depending upon her construction and size.

Although Rohweder swore that he had no difficulty in controlling the men as they came aboard; that there was always a policeman on the pier to assist him in restraining the men from coming aboard whenever he deemed it necessary to do so, still, when it is considered that in the discharge of his duties he was required, upon reaching the pier, to control the boat; that it was dark; that he did not put out lines, but held the boat to the pier with the motor, heading her downstream into the tide—it is difficult to believe that he was able to prevent men from hastening into the cabin and overcrowding the boat. No one was requested by him to prevent overcrowding. There was also evidence of over-

crowding on prior occasions, when a seed ship arrived for unloading. At such times a larger number of laborers usually answered the advertisements, and approximately 80 to 90 including regular employees, were taken aboard. This occurred frequently, according to the witnesses Johnson, Lang, Kratovil, Dingle, and others. That a few, who so testified, were discharged employees is insufficient reason for discrediting their testimony in view of its corroboration by others. Stover's presumed knowledge and privity of overloading at such times was also, in view of his agency, the knowledge and privity of the owner. He testified that he never saw more than 75 men carried, and that he had disapproved of as many as that being carried; that he relied entirely upon the competency of Rohweder. Inasmuch, however, as Rohweder, Lang, and Dingle, alone on their respective runs, not only had charge of the boat, but also the control of the number of men coming aboard, I think the contention has merit that Stover knew, or should have known, of the general overcrowding on these occasions which followed from the advertised solicitation of workmen to report at the pier.

[12] It is next urged in opposition to limitation of liability that the Linseed King had an insufficient crew. No one was particularly designated to aid Rohweder to prevent overcrowding, either on the occasion in question, or at other times. His duties were to operate the boat, to look out, handle lines, tend the engine, which was located amidships in the cabin, and, as said, supervise the boarding of the passengers. He said that invariably there was a regular workman aboard, who voluntarily helped him, and moreover, that Stover told him he could have a man any time he wanted one, but no one was actually assigned to aid in navigation or prevent overcrowding. Stover swore that on Sunday afternoon, he instructed McHale, the dock foreman, to have Rohweder make an extra trip on Monday morning, and McHale swore that Stover instructed him that whenever there was a seed ship in to "give a man to the (motorboat) captain, to help him and keep those men inside the boat." The quoted instruction appears to have been general and did not specifically apply to the trip in question. In any event, to detail an extra man to keep the men inside the boat, did not constitute a sufficient crew for the proper operation of the boat. Nor does the license (Exhibit S), issued by the Bureau of Navigation, stating "number. of crew, 1," operate

to exonerate petitioner from blame for insufficiency of crew, in view of the fact that it was manifest that a larger crew was necessary.

It is next contended that claimants who have brought actions for damages—many being administrators of intestates who were drowned—and claimants who have answered the petition cannot assert their claims in this proceeding; that claims of dependents come within the provisions of the New Jersey Workmen's Compensation Law (P. L. 1911, p. 134, as amended by P. L. 1913, p. 302), and, unless petitioner is exonerated from liability, the question of its liability for damages or for compensation under the state statute must be decided at this time. On claimants' behalf it is urged that the single issue presented by the petition to which answer has been made, is whether the benefits of the limitation statute were rightly invoked, and questions of damages in the regular course of procedure should be submitted and decided in the first instance by the special commissioner. The petition, after alleging the disaster for which it disclaims liability, states that actions at law and libels for damages in large amounts in various jurisdictions have been brought, including claims for compensation filed with the New Jersey Compensation Bureau, and that other actions at law and proceedings for enforcement of claims are in contemplation. On filing an ad interim stipulation, such actions and proceedings were enjoined.

[13] Having determined that the petition must be denied, the proceeding must be continued in this court under the monition for the purpose of passing upon the rights of all claimants filing their claims. The question of procedure at the outstart sounded interesting and important, since there existed considerable uncertainty in relation thereto (see Benedict on Admiralty [5th Ed.] vol. 1, §§ 488, 512, 516), which has now been definitely removed. In The Titanic (D. C.) 204 F. 295, Judge Hough, after discussing the various adjudications applying to the subject, reached the conclusion that a petition for limitation of liability confers exclusive jurisdiction upon the admiralty court, not only to determine petitioner's rights to the benefit of the statute, but also, upon denial of such right, to enforce rights of claimants in full. He refused to modify the injunction order restraining suits in other courts, and further said that the only reason for a claimant not wishing to come into the proceeding was a desire for a jury trial, which, however, "was

not a part of the right," but merely an incident to the remedy. This view has recently been approved by the Supreme Court, Chief Justice Taft writing the opinion, in Hartford Accident Co. v. Sou. Pacific, 273 U. S. 207, 47 S. Ct. 357, 71 L. Ed. 612, wherein it was clearly decided that a limitation of liability proceeding does not terminate, because limitation is denied; but the court may proceed to adjudicate all claims against the vessel and her owner, both in rem and in personam, by reason of the res which petitioner has surrendered to the custody of the court, "whether," the learned court said, "their claims are strictly in admiralty or not."

Since proctors for claimants assert that they desire an opportunity to show that the New Jersey Workmen's Compensation Law, termed by them an elective act, is inapplicable, and that further testimony is necessary to establish its inapplicability, the case must take its usual course before the special commissioner, without deeming it necessary to determine the question, at this time, as to the application of the Workmen's Compensation Act, or as to whether the rights of claimants have been properly asserted by dependents or administrators.

[14] At the hearing I expressed doubt as to whether the limitation statute was applicable to the type of boat used to transport the workmen or passengers across the river to the petitioner's plant, but my attention is drawn to The Luvina, 1927 A. M. C. 327, Warnken v. Moody (C. C. A.) 22 F.(2d) 960, The Miramar (unreported), and The Oneida (C. C. A.) 282 F. 238, which involved houseboats and motorboats, and wherein it was decided that limitation acts might be invoked by their owners. It is therefore ruled that the Linseed King was a vessel within the meaning of the act.

[15] My conclusion is that the evidence preponderatingly shows that fault and negligence were committed in the navigation of the Linseed King, in consequence of which injuries were sustained by survivors and numerous lives lost, and, furthermore, that petitioner has not shown that the disaster was without its privity and knowledge. On the contrary, I find the evidence sufficient to warrant the determination that the occurrence was with the privity and knowledge of petitioner's superintendent and manager, under whose supervision the boat was operated, and whose privity and knowledge is imputable to the corporation.

An interlocutory decree may be entered on notice.