## THE NEREID.

### BLACK v. THE NEREID et al.

### No. A—8774.

District Court, D. New Jersey.

April 24, 1941.

John C. Blandy, of Camden, N. J., and Howard M. Long, of Philadelphia, Pa., for libellant.

Edison Hedges, of Atlantic City, N. J., for respondent.

AVIS, District Judge.

The libellant was injured seriously by reason of the partial or complete overturn of the Gas Screw Nereid in Great Egg Harbor Inlet, between Longport and Ocean City, New Jersey, on September 26, 1937, and instituted this suit for damages against the vessel and its owner, based upon the alleged negligent operation of the vessel.

I find as facts:

(1) Respondent John I. Somers, who resided at Pleasantville, New Jersey, was the sole owner of the Nereid at the time libellant sustained his injuries.

(2) That said Nereid is a fishing boat 26 feet long and 8½ feet beam.

(3) Prior to September 26, 1937, libellant had arranged with respondent Somers to take a party fishing, including libellant; said arrangement or agreement being for hire and for which service respondent was to be paid a certain fee or passage money. Neither the pleadings nor the testimony discloses the compensation to be paid, but undoubtedly respondent was a private carrier for hire.

(4) The arrangements were made for a fishing trip and the intention was to sail the Nereid to the Atlantic Ocean through the inlet aforesaid.

(5) On September 26, 1937, shortly after 8 o'clock A. M., respondent, with seven passengers, including libellant, left the dock at Ninth Street and the Bay, Ocean City, New Jersey, aboard the Nereid headed for the inlet toward the Atlantic Ocean.

(6) Before leaving the dock respondent advised his passengers generally that it was a question whether he would take them out in the ocean, but they would go out to the inlet to see if it would be advisable to proceed to the fishing grounds.

(7) The son of respondent, one Harry Somers, who was about 22 years of age, was on the top of the cabin, towards the bow of the boat, as it came under the Longport-Ocean City bridge, heading towards the inlet.

(8) At a point near buoy "B", and about 1500 feet westerly of the bar of the inlet, a wave, approximately 15 feet in height, suddenly made up in front of the boat, hit it, and the young man Harry Somers was washed overboard. As he came past the boat, one of the passengers grabbed his collar and he was pulled in the boat.

(9) According to the testimony of Robert B. Black, a witness called for libellant, "It all happened in a split second", and all of the witnesses who saw it said it came up very quickly.

(10) Immediately after this wave struck, another wave of about the same size was making up in front of the boat, coming towards it, and about 200 feet away. The captain, respondent, as soon as his son was pulled in the boat, steered the boat sharply to the right or starboard, endeavoring, as he testified, to run away from the second large wave.

(11) The second wave struck the boat, whether at broadside, as some witnesses testified, or quartering off, as respondent testified, does not seem important, but the boat turned on its side to at least a per-

pendicular, throwing out all of its occupants, except possibly the captain and a member of the party, one Elwood A. Conover, who testified that he did not leave the boat. The captain testified that he was thrown overboard, but found himself in the boat when it righted, which it did promptly.

(12) Libellant was later pulled in the boat, and it was found he had a severely injured right hand and that on his leg in the rear he had a deep mangled cut from a point about 5 inches above the knee joint downward to a point about 4 inches above his ankle. No direct testimony was offered showing what caused this cut, but from its nature and severity and the fact that the engine was operating when the wave hit the boat, I am satisfied he was struck by the propeller of the boat.

(13) Two of the men who went overboard were picked up by another boat, and after the rest were in the Nereid she returned to the Coast Guard Station under her own power. Libellant's wound bled profusely, and one of the party prepared and applied a tourniquet in the boat. At the Coast Guard Station an ambulance was called and libellant was conveyed to the Atlantic Shores Hospital for treatment.

(14) None of the witnesses made any complaint to the respondent as to the condition of the seas prior to the first wave hitting the boat, as a matter of fact, it appeared quite clearly that although a heavy sea was running there was nothing prior to the first wave striking the boat which indicated a dangerous condition.

(15) Other fishing boats were leaving the bay and passing out into the ocean at or about the same time that the Nereid was struck, and their captains testified that although they were able to ride the two waves they were both very unusual and extraordinary in height.

With this state of facts libellant alleges, in his brief, four charges of claimed negligence on the part of respondent, making the boat and respondent liable. They read as follows:

"(a) In that the said 'Nereid' under the operation and control of Respondent, John I. Somers, was negligent in proceeding in said Inlet out towards the ocean in view of the tidal, weather and wave conditions existing at the time.

"(b) In that the said 'Nereid' was so negligently and carelessly operated by the said Respondent, as to cause the Libellant together with several other passengers to be thrown and washed by the waves from said 'Nereid' into the water as the 'Nereid' was crossing the Bar at the entrance to said Inlet.

"(c) In that after Libellant had been thrown into the water as aforesaid, and while he was using his best efforts to save his life, the 'Nereid' was so operated and handled by the said Respondent that her propeller was brought into contact with the body of the Libellant, the propeller being in rapid motion at the time, and severely injured Libellant on his arms and legs.

"(d) In that neither the 'Nereid' nor Respondent, made any proper effort to save the Libellant by throwing life-rings or life-preservers so that he could remain above the water, and so negligently maneuvered the 'Nereid' in and about Libellant's rescue and in other respects to be shown at the Trial."

As to charges (c) and (d), there is no evidence of facts indicating that the respondent could do any more than he did to rescue libellant, or any of the other occupants of the boat. No negligence can be ascribed to respondent on either of these charges.

Charge (a) is general in its nature and questions the right of the respondent without apparent negligence to even leave the dock and proceed up the Bay to the entrance to the inlet. It does not seem to me that this charge can possibly be sustained. The evidence is quite clear that no particularly unusual condition of tide or seas would suggest negligence in starting out to investigate conditions at the inlet. The testimony is also quite clear that before the unusual wave, there was no sea that was terrifying or appeared to be dangerous; the witnesses for libellant testifying that the sea in the bay was not dangerous and no objection was made by any member of the fishing party. There was no lack of a proper degree of care in leaving the wharf to investigate and explore conditions.

Charge (b) relies upon the alleged negligence of the respondent in operating the boat. It was the duty of respondent, under the circumstances, to exercise what is called a high degree of care. No complaint is made that the boat was not seaworthy, or that it was not efficiently equipped for the purpose for which it was to be used. The negligence charged is that the respondent should not have taken the

boat out to the point where it was struck by the large wave; that he should have observed the conditions before the boat came in contact with the first wave, and was negligent in handling his boat to avoid the impact of the second wave.

Was the respondent negligent in any of these particulars which made his boat or himself personally responsible for damages sustained by libellant?

Discussion and conclusions of law.

A number of cases have been called to the attention of the Court in the brief of counsel for libellant, and it seems desirable that the facts by which the principle established in those cases and others which the Court has found should be compared with the facts in the instant case.

In Texas & Gulf S. S. Co. v. Parker, 5 Cir., 263 F. 864, in which there was a decree for the injured party in a case involving limitation of liability, the negligence is quite clear. The master of a small freight steamship, with knowledge that a dangerous hurricane was making up in the Gulf and that it would probably cross his path, left Galveston for Corpus Christi. The steamer foundered in the hurricane, and negligent conduct of the master was sustained based upon the starting of the voyage in the face of hurricane predictions.

The Linseed King cases are referred to in libellant's brief, and considerable reliance is placed on the doctrine stated in those cases. The first decision is found in D.C., 24 F.2d 967. It was a proceeding instituted in admiralty under the limitation of liability act and involved necessarily the question of negligence. The negligence complained of was the operation of a small boat across the Hudson River from New York to Edgewater, New Jersey, carrying employees of the owner of the boat to and from work in New Jersey. On the fateful trip the boat was carrying about 78 passengers, struck an ice floe which stove a hole in the forward part of the boat, and an unknown number of the passengers were drowned. It appeared that the boat was not constructed so as to withstand the blow of ice, and orders had been given to the operator not to run the boat when ice was in the river. Several questions were considered in the case, but only the negligence conclusions apply in the instant case.

Judge Hazel in his opinion as to negligent operation, after reciting some of the testimony indicating that there had been considerable ice floating in the Hudson River at a place of crossing for several days before the collision, said: "In the light of such testimony, it is indeed to be wondered why Stover, Rohweder, and Balz did not foresee that it was perilous to continue the trips. Rohweder was negligent, in my opinion, in taking passengers on board, knowing that he would have to pass through ice before reaching the clear, and that doing so was fraught with danger. Stover and Balz knew, or should have known, of the ice fluctuations in the river, due to wind, current, and tides. And the fact that the launch was not regarded by her owner as seaworthy to withstand ice conditions may be assumed from the instructions that had been given to cease her trips on its appearance. The probability of ice appearing, in view of the temperature, should have prompted direct instructions to abandon the trips." 24 F.2d 967, 971, 972.

Apparently an interlocutory decree was ordered in the above case and all matters referred to a commissioner to ascertain the damages of injured parties.

It next appears in the reports in D.C., 48 F.2d 311 on exceptions filed to the master's report relating to the applicability of the Workmen's Compensation law and the right of certain petitioners to recover damages and the amount thereof. The question of negligence as decided by Judge Hazel in the original hearing was not disturbed, but in the later case it was determined that certain of the persons on the boat came under the provisions of the Workmen's Compensation law, and the court dismissed their cases from the admiralty proceedings, and some changes were made in the amounts allowed by the commissioner to sundry claimants.

From these decisions an appeal was taken to the Circuit Court of Appeals for the Second Circuit and the opinion of Judge Learned Hand is reported in 52 F.2d 129. In that court the result was an affirmance. It appears that the company officials had recognized that the launch was not fit to encounter ice and had directed the officers at Edgewater to discontinue her service as soon as ice appeared in the river, and further that the boat should not be exposed to floes or heavy cakes.

The court said on page 132 of 52 F.2d: "It was a fault to allow her to go out, when there was reasonable expectation that such ice might be met."

Further, as to the negligence, the court said: "If employers are justified in undertaking such transportation at all, they must use the greatest of possible care; chances must be ruled out, though remote. We do not say that they can be so justified, but when such a craft, so crowded, is used at a season when ice is likely to be in the river, and has already been seen within forty-eight hours, nothing but the extremest precautions could exculpate any one concerned in the venture, if even these will serve." 52 F.2d 129, 132.

There was no question, as the court viewed the facts in that case, that the master of the boat was negligent because he had received strict instructions not to use her when ice was in the river. The main question there involved was the liability of the owner, the question of limitation, and the applicability of the Workmen's Compensation law.

The Supreme Court granted certiorari and in its conclusions affirmed the negligent finding, held the owner responsible notwithstanding the orders issued, but reversed the Circuit Court as to the applicability of the Compensation law and held that all of the claims were solely cognizable in the admiralty court. The case is reported in 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903. After reciting the facts quite completely, the opinion deals with negligence in the following words:

"The first question for decision is whether Kellogg & Sons, as owner, was entitled to a decree limiting its liability. The master's negligence is not denied; indeed the owner proved that definite and peremptory instructions had been given him never to run when there was ice in the river. His disregard of these was the proximate cause of the disaster." 285 U.S. 502, 509, 52 S.Ct. 450, 452.

The next case is that of Calanchini v. Bliss, 9 Cir., 88 F.2d 82. The negligence charged in that case and sustained by the court as actionable upon which the libellant recovered was that respondent operating a boat having a rated capacity of ten passengers capsized in the open sea when it had eighteen passengers aboard. The court held that the capsizing was not an act of God but due to overloading the boat.

In the case of Petition of Liebler (The Francesca), D.C., 19 F.Supp. 829, a girl swimmer with her boy companion were taken aboard a speed boat and permitted to sit on top of the cabin in front of the wind shield. It was claimed and apparently adopted by the court as a fact that a sudden change of direction of the boat at high speed threw the girl into the water and she was cut by the propeller causing her death. It was held to be negligence to take the girl aboard and not provide for her a safe place on the boat.

None of these cases, so far as facts are concerned, is on a parallel with the facts in the instant case. The captain was competent, his boat was apparently sound and well motored, and was not overloaded.

The accident was caused, in my opinion, by an unusual wave which, under the testimony, could not possibly have been anticipated. I do not know, nor does any one else, what might have happened if some other course had been taken. However that may be, I cannot conclude that there was any actionable negligence which would justify the Court in assessing damages against the respondent. The libellant was severely injured, and it is unfortunate that he cannot be reimbursed, but you cannot take money from one and give it to another without legal justification.

Having decided as a matter of fact that there was no actionable negligence, it necessarily follows as a matter of law that there can be no recovery.

The prayer of the libel is denied and the libel will be dismissed.

Decree should be presented to the Court.