### THE LINSEED KING.

### In re SPENCER KELLOGG & SONS, Inc.

District Court, S. D. New York.
Dec. 17, 1930.

See, also, 24 F.(2d) 967.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, Charles W. Hagen, and George S. Brengle, all of New York City, of counsel), for petitioner.

Elizabeth Robinson and Lucien V. Axtell, both of New York City (Elizabeth Robinson, of New York City, of counsel), for claimants.

Lester Hand Jayne, of New York City, for claimants Roberts, Sims, McEachin, and Varouxaki.

Kurzman & Frank, of New York City, for claimant Ifill.

Marsh, Spencer & Marsh, of New York City, for claimant Navas.

Oeland & Kuhn, of New York City, for claimant Hicks.

PATTERSON, District Judge.

This is a limitation of liability proceeding under section 4283 of the Revised Statutes (46 USCA § .183). It comes before me on exceptions to a commissioner's report.

On December 20, 1926, the Linseed King sank in the Hudson River. Many lives were lost. The survivors managed in one way or another not to be drowned, but suffered from exposure. The Linseed King was a launch owned and operated by Spencer Kellogg & Sons, Inc., which had a manufacturing plant at Edgewater, N. J. Many of the men employed there came from New York City. The launch was used to carry them from a pier on the New York side to the place of work on the New Jersey side. At the time in question, the launch carried not only employees but also men who made the trip in the hope of securing work. No fares were charged, and the general public was not invited to ride. In short, the launch was a private carrier, operated by the employer for its own convenience and that of its employees. The facts as to this appalling disaster have already been fully set forth in an opinion by Judge Hazel, and need not be repeated. The Linseed King (D. C.) 24 F.(2d) 967. The prior steps in this proceeding are of importance, however, because of the bearing of the New Jersey Workmen's Compensation Act (P. L. 1911, p. 134, as amended), upon the rights of the parties.

The proceeding was initiated in March, 1927, by Spencer Kellogg & Sons, Inc., as owner of the launch. The petition, after setting forth the happening of the calamity, alleged that it was not due to any fault on the petitioner's part, and that many lawsuits for loss of life and personal injuries had been commenced, and that claims had been, or would be, filed with the New Jersey Workmen's Compensation Bureau. By reason of such facts, the petitioner stated that it sought the limitation of liability afforded by the Revised Statutes, and that it also desired to contest any liability whatsoever, except that it did not contest the right of claimants to file claims with the Workmen's Compensation Bureau. The value of the Linseed King at the end of the voyage was alleged to be $1,500. In the prayer for relief, the petitioner asked for an order directing the issuance of a monition to all persons claiming damages, citing them to appear before a commissioner and to make proof of their claims, and also to answer the allegations of the petition (paragraph 3); for an injunction staying the prosecution and determination of all suits and proceedings in respect of any claims arising out of the voyage, with liberty, however, to any claimant to file his claim with the New Jersey Workmen's Compensation Bureau (paragraph 4); and for an adjudication that the petitioner was not liable to any extent on any such claims except such as should be proper and legal claims under the New Jersey Workmen's Compensation Law, and that, as to such compensation claims (and any other liabilities imposed upon it), the liability be limited to the value of the launch (paragraph 5). In due course there was an order of this court on March 5, 1927, directing the issuance of a monition against all persons claiming damage from the disaster, and enjoining the beginning, prosecution, or determination of all suits or proceedings except the filing of claims with the Workmen's Compensation Bureau. The order directed that service of it be made upon the Compensation Bureau, and it was so served. A restraining order to the same effect was also issued. Numerous claimants then came in and controverted the petitioner's claims of nonliability and limited liability.

The matter came on for trial before Judge Hazel in January, 1928. He found that there was negligence in the operation of the Linseed King, and further that the petitioner had knowledge or privity as to such negligence. Accordingly, the petition for limited liability was denied, but the proceeding was continued in order to determine the liability of the petitioner on an unrestricted basis. (D. C.) 24 F.(2d) 967. The point was pressed by the petitioner before Judge Hazel that the New Jersey Workmen's Compensation Law was applicable to the claims of all persons who were employees or whose decedents were employees. The claimants, however, insisted that the sole issue at that time was whether the petitioner was entitled to limit its liability, and that further testimony would reveal the inapplicability of the Workmen's Compensation Law. Judge Hazel did not deem it necessary or appropriate to pass upon this point at the time, and sent the case to a commissioner to take proof as to the Workmen's Compensation feature of the case as well as to matters of damages.

The commissioner took proof as to some seventy-eight claims. In his report he has recommended no awards in several cases, and

awards ranging from $300 to $15,000 in the majority of cases. As to workmen's compensation, the commissioner held the New Jersey statute inapplicable, first, because the tort was maritime, and, second, because the nature of the proceeding conferred upon the admiralty court jurisdiction to hear and determine every claim of any nature growing out of the disaster. Exceptions have been filed. The exceptions of the claimants go to the commissioner's refusal to recommend awards to certain persons and also to the adequacy of the awards recommended in other cases. The exceptions of the petitioner, in addition to complaining of awards in particular cases, present the broad proposition that there should be no awards in cases involving employees, because of the Workmen's Compensation Law. I will first give my views as to the applicability of the Workmen's Compensation Act to this case.

1. The New Jersey Workmen's Compensation Act is found in Laws of 1911, c. 95, as amended. Section 1 provides for "compensation by action at law," in which actions the employer is stripped of certain common-law defenses, and in which the employer's negligence is the main issue. Section 2 sets up "elective compensation" for personal injury or death of the employee arising out of and in the course of the employment, irrespective of the employer's negligence. This plan provides a schedule of installment payments in the manner typical of such statutes. It takes effect only by agreement of the parties, but every contract of hiring is presumed to have been made with the plan in mind, unless one party or the other has given written notice to the contrary prior to the injury or death (paragraph 9). And such agreement to abide by the plan operates as a surrender by the parties of any other method, form, or amount of compensation, a surrender binding upon the employee, his personal representative, widow and next of kin, as well as upon the employer (paragraph 8). Employers subject to the act are obliged to insure or to carry their own insurance. The Workmen's Compensation Bureau is the body by which the law is to be administered, although appeal to the courts from determinations of the bureau is provided for. There are, of course, many other details covered in the act, but the above outline will suffice for present purposes.

■ The rights of the parties under section 2 are contractual. Rounsaville v. Central R. R. Co., 87 N. J. Law, 372, 94 A. 392; Deeny v. Wright & Cobb Lighterage Co., 36 N. J. Law J. 121. Where the contractual status as to compensation exists between employer and employee, and injury or death is caused by accident arising out of and in the course of employment, no other remedy than under the compensation plan can be pursued by the employee or his representative; hence the personal representative of a deceased employee killed in the course of employment cannot maintain an action at law for wrongful death against the employer. Gregutis v. Waclark Wire Works, 86 N. J. Law, 610, 92 A. 354. The situation is as if the employee had said to the employer: "In consideration of your promise to pay the award set forth in the statute, in case I shall be injured or killed by accident arising out of and in the course of employment, I now relinquish any other rights that I or my representatives might otherwise have had against you by reason of such future injury or death, and will look solely to the workmen's compensation award," and as if the employer had then made the promise. The statute is said by the New Jersey courts to be a remedial law of prime import, to be broadly and liberally construed. Jersey City v. Borst, 90 N. J. Law, 454, 101 A. 1033; O'Mara v. Kirch (N. J. Err. & App.) 147 A. 511. While the compensation plan is elective, the election against the plan must be made prior to the injury or death, and it must be made in writing. After the accident has occurred, neither party can elect against the plan.

■ There can be little doubt that, as to regular employees who were on the boat at the time of the disaster, injury or death came from an accident arising out of and in the course of the employment. It is true that they had not yet commenced the day's work, and that they did not receive pay for the time spent in crossing the river. They were on their way to work, however, and were being transported in a conveyance owned and operated by the employer day after day to carry them to work, for the convenience of employer and employees alike. In the New Jersey cases, such transportation is said to be an incident of the employment, and injury or death of an employee while being so transported is held to arise out of and in the course of the employment. Fisher v. Tidewater Bldg. Co., 96 N. J. Law, 103, 114 A. 150; Soden v. Public Service Co. (N. J. Sup.) 134 A. 560, affirmed in 103 N. J. Law, 713, 137 A. 437; Rachels v. Pepoon, 135 A. 684, 5 N. J. Misc. R. 122; Alberta Contracting Corporation v. Santomassimo (N. J. Sup.) 150 A. 830, 831. There are numerous rulings by the New Jersey Workmen's Compensation Bureau to the same effect. Gebhardt v. Me-

keel, 5 N. J. Misc. R. 475; Bakos v. Knight Const. Co., 5 N. J. Misc. R. 443; Fredman v. Safier, 5 N. J. Misc. R. 459; Hunter v. Atlantic City Electric Co., 7 N. J. Misc. R. 725. The fact that the employees were not paid until they arrived on the job was held immaterial in the Alberta Case, supra, where the New Jersey Supreme Court also said:

"We believe that the pertinent rule to be extracted from the cases is this: The relation of employer and employee continues while the employee is riding to and from his employer's premises, in a truck used in connection with his employer's work, by direction of his employer, with his knowledge and acquiescence in the continued practice, which was beneficial to both the employer and employee; and an injury sustained while so riding arises out of and in the course of his employment."

The claimants point out that the accident occurred in waters forming part of New York. The New Jersey Compensation Act and the contract for compensation made under it are held to cover injury or death occurring outside the state, where the employment is a New Jersey employment. This seems to be the general rule under elective compensation statutes. Rounsaville v. Central R. R. Co., supra; Foley v. Home Rubber Co., 89 N. J. Law, 474, 99 A. 624; Deeny v. Wright & Cobb Lighterage Co., supra. It is also argued that, since the disaster happened on navigable waters, the Workmen's Compensation Act is excluded by admiralty law, by reason of what was decided in Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 S. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900. In the Jensen Case the employment was a maritime one. Under such conditions, the New Jersey act has no operation. March v. Vulcan Iron Works, 102 N. J. Law, 337, 132 A. 89. Here, however, the employment (except as to men engaged in navigating the launch, and as to men whose work it was to unload ships) was nonmaritime. The decisions of the Supreme Court subsequent to the Jensen Case show that the local compensation statutes are not excluded, unless the tort occurred on navigable waters, and unless also the employment was maritime. Grant Smith-Porter Co. v. Rohde, 257 U. S. 469, 42 S. Ct. 157, 66 L. Ed. 321, 25 A. L. R. 1008; Millers' Underwriters v. Braud, 270 U. S. 59, 46 S. Ct. 194, 70 L. Ed. 470; Alaska Packers' Ass'n v. Industrial Accident Commission, 276 U. S. 467, 48 S. Ct. 346, 72 L. Ed. 656.

Finally, it is pointed out by the claimants that the employees were being transported from New York to New Jersey; that interstate commerce is involved; and the argument is that the New Jersey statute is for that reason rendered inoperative. There is no merit in this argument. Of course, where employees of common carriers by railroad are injured or killed while engaged in interstate commerce, Congress has covered the entire field by the enactment of the Federal Employers' Liability Act (45 USCA § 51–59), and state workmen's compensation statutes are excluded. New York Central R. Co. v. Winfield, 244 U. S. 147, 37 S. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139. But here the employer was not a common carrier, and did not operate a railroad, and Congress has never, so far as I know, passed any statute relative to the liability of such an employer for injury or death suffered by its employees while incidentally being carried from state to state. The matter is within the zone of valid state legislation. Leisy v. Hardin, 135 U. S. 100, 10 S. Ct. 681, 34 L. Ed. 128.

There is undisputed evidence in the case that no written notice was given by any party prior to the accident, whereby an election against the compensation system was registered. My conclusion, therefore, is that the elective system of compensation embodied in the New Jersey Workmen's Compensation Act governed the injuries and deaths of all the employees hired for nonmaritime work. The remedy provided by that system (awards by the Compensation Bureau) was the exclusive remedy for all such employees and their dependents. It seems clear that the suits at common law, the suits in admiralty, and the suits under death statutes which had been commenced could not have been maintained over the objection of the employer that the right to obtain compensation or damages by such suits had been surrendered prior to the accident. Gregutis v. Waclark Wire Works, supra; O'Mara v. Kirch, supra; Delaware, etc., R. Co. v. Peck (C. C. A.) 255 F. 261; Barnhart v. American Concrete Steel Co., 227 N. Y. 531, 125 N. E. 675.

A more difficult question is whether the petitioner, by instituting and maintaining this limitation proceeding, has lost its right to confine the employees (including in that term personal representatives of deceased employees) to their workmen's compensation remedy. The employees argue that the petitioner has lost such right, basing the argument upon waiver, estoppel, rescission of contract, and finally upon considerations peculiar to limitation proceedings. Before discussing these grounds, however, it may be

observed that the petitioner as matter of law could not limit its liability to pay workmen's compensation awards in cases of injured or deceased employees, even though it had been free of fault. There seem to be no authorities on the point, but it is plain enough on principle. An employer's liability to pay compensation awards under the New Jersey act arises from his personal contract. Rounsaville v. Central R. Co., supra. It is settled that the limitation acts (R. S. § 4283, ff. (46 USCA § 183 et seq.) do not apply to liabilities resting on personal contracts of the owner. Pendleton v. Benner Line, 246 U. S. 353, 38 S. Ct. 330, 62 L. Ed. 770; Luckenbach v. McCahan Sugar Co., 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522; Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631; The E. S. Atwood (C. C. A.) 289 F. 737. To some extent, this is true even of implied contracts. The Loyal (C. C. A.) 204 F. 930. In this connection, it is interesting to note that in 1927 Congress expressly provided that an employer's liability to make payments under the Longshoremen's and Harbor Workers' Compensation Act (33 USCA §§ 901–950) shall not be subject to limitation by reason of the limitation acts (Act of March 4, 1927). The limitation acts therefore gave the petitioner no protection against workmen's compensation claims, and I am convinced that any employee, by pressing an exception or motion against the petition, could have promptly obtained a dismissal of this proceeding so far as it concerned him.

■ If the term "waiver" is used in its conventional sense as the intentional relinquishment of a known right, there has been no waiver by the petitioner of its right to insist that all employees be confined to their remedy under the compensation statute. It took the stand in its petition that their rights were to be determined by the Compensation Bureau. It has never departed from this position. True, it erroneously sought to restrict its liability upon the awards which it expected would be made by the Compensation Bureau, but this does not establish waiver.

■ The elements of equitable estoppel are lacking. The petitioner now says that the employees have no claim against it sounding in damages, but have simply the right to get compensation awards under the compensation statute. This has been its position at all stages of the case. There have been no prior representations to the contrary and no prior conduct antagonistic to its present position.

Moreover, there is nothing in the case to show that any of the claimants were misled by the position taken by the petitioner. Their failure to obtain compensation awards, so far as shown by the record, was not because of anything done or said by the petitioner in this proceeding, but was due to their belief that the Workmen's Compensation Act, for one cause or another, had nothing to do with the case. In this connection it should be noted that the time within which claims arising from this accident may be filed with the New Jersey Bureau has not yet expired (New Jersey Laws of 1924, c. 187, § 6; Franko v. Ohio Chemical Co., 150 A. 221, 8 N. J. Misc. R. 376), and the petitioner has announced before me its readiness to pay awards by the bureau. Having successfully contended in this proceeding that the Compensation Bureau had sole jurisdiction, it would obviously be estopped before the bureau to face about and dispute the jurisdiction, or to deny that the injuries and deaths of employees were as fully covered by the act as if they had occurred in its own plant, or to contend (for at least a year hence) that the right to file claims before the bureau had expired. It may also be noted that, at the opening of trial before Judge Hazel in January, 1928, the petitioner offered to pay all employees and their personal representatives the amounts due them under the Workmen's Compensation Law, abandoning to this extent its claim of limited liability; but the claimants rejected the offer.

The case of In re Famous Players Lasky Corp. (D. C.) 30 F.(2d) 402, 1929 A. M. C. 300, is not in point as to estoppel. There seamen were injured while working on a ship off the California coast. The court, following the Jensen Case, held that the California Workmen's Compensation Act was not controlling, and awarded damages in a limitation proceeding. Two of the injured seamen, however, had filed claims with the Compensation Bureau, and the claims had been paid despite the lack of jurisdiction. As to these two men, it was held that they were estopped to insist upon damages in admiralty. This because they had taken the position that the Compensation Bureau should make awards and because they had been successful in that position to the extent of receiving payments in full. It is a familiar rule that one who has successfully maintained a position in litigation is estopped later to say that such position was erroneous. The situation here is not analogous.

■ The argument is made that the petitioner had bound itself by contract to the

statutory compensation plan, with its features of awards by the New Jersey bureau and prompt payment of such awards; that the petitioner broke these contracts by disputing its liability to pay any awards except to a trifling extent, and also by restraining the employees from proceeding to obtain awards; that such conduct amounted to a repudiation by the petitioner of the contracts or constituted a breach of such gravity that the employees could treat the contracts as rescinded; and that consequently the latter are entitled to assert their rights at common law or in admiralty. I own that at first this line of reasoning struck me as sound. There is no gainsaying the fact that the conduct of the petitioner has been in violation of its contractual duty under the New Jersey compensation plan. It asked for and obtained an injunction which, while permitting the filing of compensation claims in New Jersey, obstructed any further progress along that line for a considerable time. One of the valuable features of workmen's compensation is the speedy relief given to injured employees and to dependents of employees who are killed, without putting them to litigation beyond what may be involved in the determination of claims by the Compensation Board and in appeal from such determination. But the conclusion that the employees were thus remitted to their rights at common law or under death statutes does not follow. The general rule is that, where a claim has been released for a promised consideration, which is not given, the claimant may treat the release as rescinded and recover upon the original claim. Williston on Contracts, § 1457. This rule might be applicable here if the employees had at one time had claims in tort against the employer, which claims they had surrendered upon making contracts for the payment of compensation, and if the employer had later declined to pay the promised compensation. But, under the New Jersey statute and the contract resulting from it, they never had claims in tort against the employer, and they never had claims in contract for injury or death except their claims under the compensation plan. They certainly had no claims for injury or death prior to December 20, 1926, and before that time came they had made an agreement surrendering all other rights than the right to get workmen's compensation awards. So they are not asking the court to revive claims which they once had at common law, in admiralty, or under a death statute; they are in effect asking the court now to create for them claims which they never owned, claims which they could

have had but for the Compensation Act and the resulting contract. I conclude that there is no room here for the rule of rescission. The remedy for the petitioner's breach of contract is to hold it for interest upon the delayed payments of compensation, and I have no doubt that the Compensation Bureau will attend to this matter in making awards.

Stress is also laid by the claimants upon the rule in Hartford Accident Co. v. Southern Pacific Co., 273 U. S. 207, 47 S. Ct. 357, 71 L. Ed. 612, to the effect that, where a shipowner sues to limit liability, and limitation is denied, the proceeding does not necessarily terminate, but the court may proceed to adjudicate all claims arising from the accident, whether independently cognizable in admiralty or not, and may render judgment both in rem and against the owner in personam. This rule has already been applied in this case as to all claims which do not involve employees. But to say that the court may entertain, in the case of employees, tort claims which never existed, and may award damages without relation to the amounts specified in the Compensation Act and agreed upon by the parties as the employees' sole measure of recovery, is to carry the Hartford Case far afield. That case dealt with procedural rights of the parties; it does not hold that their substantive rights are changed by the fact that the shipowner has unsuccessfully sought to shelter himself under the limitation acts. One of the reasons for the result reached in the Hartford Case was the inequity of sending claimants empty away, to begin new suits, after the owner had impeded them in the bringing of suits. I am sensible of the fact that here the owner contributed toward delaying the claimants in the pursuit of their real remedy, and to this extent its conduct may be termed inequitable. But I cannot believe that the claimants thereby acquired tort claims which they never had before or that the owner is thereby equitably estopped to say that they have no claims sounding in ordinary damages, but have claims only in workmen's compensation.

■ The most that can reasonably be claimed from the authority of the Hartford Case, in connection with the present case, is that, instead of sending the parties to the New Jersey Compensation Bureau, this court ought itself to make awards to the claimant-employees upon the same basis as the Compensation Bureau would make them, and ought to render judgment in this proceeding against the petitioner in personam to cover such awards. I would be glad to do so if I had the power. The New Jersey Compensation

Act, however, like all other compensation acts with which I am familiar, requires payment in installments over a period of time. Payment in a lump sum is permitted, but only when approved by the bureau or other designated New Jersey officials. Clearly this court has not the authority or the means to order and to enforce such payments. Southern Pacific Co. v. Jensen, 244 U. S. 205, 218, 37 S. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900. In my opinion, the Supreme Court in the Hartford Case did not mean that workmen's compensation claims, or, for that matter, any other claims not cognizable in an ordinary court of law or equity, could be adjudicated by an admiralty court.

I am therefore forced to the conclusion that the claimants who were regular employees of the petitioner, hired to do non-maritime work, and also the claimants who are personal representatives of deceased non-maritime employees, cannot be given relief in this court, either by damage awards or by awards similar to workmen's compensation. Their remedy is to file claims with the New Jersey Workmen's Compensation Bureau and to obtain awards there, and it is to be hoped that they will do so promptly. From the proof before me, it seems clear that the following cases fall into this class: James Alexander, Charles D. Burns, Samuel Daniels, Domingo DeMeza, Frank Eberle, Henry McEachim, Frank Marques (Martin), Fernando Martin, Adolphus Matthias, Carlos Morales, George Nemetz, Uriah Pusey, Clifford Rawlins, John Benjamin Samuels, John Turner, John Castro, Joseph Hamilton, Eric Martin, Fred Sumner, Nathaniel Wisdom, Ernest Boyer, David H. Clarke, Balfour Corriette, Thomas Coyle, Victor Kreminsky, Juan C. Munoz, Eladio Ortiz, Carlos C. Thigpen, Paul Boots, Dominick Darco, Felipe Durate, Junius Johnson, Bernhard Lang, Louis Ortiz.

The exceptions by the petitioner to awards in the above claims are sustained. It is unnecessary to pass upon the soundness of the commissioner's refusal of awards in some of the above cases and upon the adequacy of his awards in others.

 The case of Alfred Roberts, one of the men lost in the disaster, is out of the ordinary. He was undoubtedly a regular employee, working as a chauffeur at $35 a week. But he also assisted in operating the Linseed King when he was on it, and the employer knew and approved of this practice. The man in charge of the boat testified that he would have had an extra man to assist him but for the fact that he preferred Roberts' help. To this extent, Roberts' work was maritime. The death having occurred in navigable waters, the Workmen's Compensation Act does not apply to his case. His personal representative is entitled to damages in this proceeding. Southern Pacific Co. v. Jensen, supra.

 A large number of those who perished or were injured on the Linseed King were merely looking for work, in response to an advertisement. These men were concededly not employees, the compensation statute does not cover their cases, and damages for death or injury may be given by this court. There is still a third group of men who had applied for employment several days prior to December 20th, had been given slips of paper with numbers, and had been told to report for work on December 19th, to unload a ship. These men had reported on December 19th, as instructed. They were then told that the ship had not arrived and that they should return for work the next day. They were returning when the disaster happened. They had done no work and had earned no compensation. The commissioner held that these men were employees. I do not agree. In my opinion, the status of employer and employee had not yet come into existence, and the compensation statute does not apply to these cases. Coco v. Wilbur, 104 N. J. Law, 275, 140 A. 790, seems indistinguishable. It appears, moreover, that the work expected of these men was the unloading of a ship. This would be maritime employment and the Workmen's Compensation Act does not apply to an injury or death to maritime employees which happens on navigable waters. Southern Pacific Co. v. Jensen, supra; March v. Vulcan Iron Works, supra. The Longshoremen's and Harbor Workers' Compensation Act (33 USCA §§ 901–950) was not in effect at the time of this accident. Damages are therefore to be awarded in the cases involving men in this third group.

2. There remain the cases of nonemployees, the men who had received numbers and had been promised a job unloading the ship, and also the men who came in response to the advertisements for help wanted. There also remain the cases of Roberts and one or two others whose work seems to have been, in part at least, of a maritime nature. Before considering the cases separately, I will comment upon certain matters common to many of them.

320

■ The claims are of two general classes. One class is claims for personal injuries, where survivors are claimants. The other and more numerous class consists of claims by personal representatives complaining of the death of their intestates. These latter causes of action are derived from the New York statute allowing recovery for death by wrongful act, which statute is now part of the New York Decedent Estate Law (Consol. Laws, N. Y.; c. 13). The deaths occurred in waters within the territorial limits of New York, and it is conceded that the death claims concerning nonemployees are controlled by the New York statute. Such a suit is maintainable by the personal representative of the deceased, but the damages recovered are exclusively for the benefit of the widow and next of kin, determined as in cases of intestacy with certain specified exceptions. The damages are to serve as compensation for pecuniary injuries resulting from the death of the decedent to the relatives in whose behalf the suit is brought. Decedent Estate Law, §. 132. The New York courts have held that loss of support and reasonable funeral expenses are proper elements of damage, but that nothing may be given for grief, and the correctness of these rulings, in view of the language of the statute, is obvious. Oldfield v. New York & Harlem R. Co., 14 N. Y. 310; Murphy v. New York Central R. Co., 88 N. Y. 445.

■ The term "loss of support" is not quite accurate. The inquiry is to estimate the pecuniary benefit which the next of kin would have received, by contributions, services, or inheritance, from the continuance in life of the deceased. Meekin v. Brooklyn Heights R. R. Co., 164 N. Y. 145, 58 N. E. 50, 51 L. R. A. 235, 79 Am. St. Rep. 635. The plaintiff or claimant is not obliged to prove a legal obligation by the deceased to support, nor need he show that the next of kin have no other means of livelihood. Carpenter v. Buffalo, N. Y. & P. R. R. Co., 38 Hun (N. Y.) 116.

Many of the claimants paid burial expenses. I think that it was the intention of the commissioner to allow recovery for these amounts, in so far as they were proved and appeared reasonable, and that the omission of them in the final amounts mentioned in the report was inadvertent. I will allow funeral expenses, not to exceed $275, in each case where the proof shows that the person or persons for whose benefit the claim is maintained paid such expenses. I make this limitation because in some cases the petitioner seems to have paid the undertakers' bills.

■ The claimants insist that all the death awards should carry interest from the date of death, December 20, 1926. On this feature of the case, the commissioner declared that the damages recommended were computed as of the date of the report, July 3, 1930, and should bear interest only from that day. All parties agree that the matter of interest is governed by the New York statute already referred to, which in section 132 provides:

"When final judgment for the plaintiff is rendered, the clerk must add to the sum so awarded, interest thereon from the decedent's death, and include it in the judgment. The inquisition, verdict, report or decision, may specify the day from which interest is to be computed; if it omits so to do, the day may be determined by the clerk, upon affidavits."

The claimants rest upon the first sentence quoted; the petitioner rests upon the second sentence, and says that the commissioner has covered the question of interest in a proper way. As I read the statute, the first sentence is controlling and the second subordinate. The meaning of the passage is that in all cases the plaintiff shall be entitled to interest from the date of death; that the jury, referee, or court may indicate what day is found to be the date of death; and that, in cases where the date of death is not so indicated, the clerk may determine on affidavits what the date of death was. In other words, I believe that "the day" in the second sentence means the day of death. There are, of course, cases where the date of death is matter of dispute, and the second sentence may have been intended to cover such cases. Upon this construction, both of these sentences serve a purpose. Upon the petitioner's construction, that the court, jury, commissioner, or referee may pick out a day over three years after the time of death as the date from which interest may run, the first sentence, in spite of its mandatory verb, is rendered futile, and might as well be expunged from the statute. The final judgment to be entered will therefore direct the clerk to add to all awards in death claims (but not in personal injury claims) interest at 6 per cent. from December 20, 1926.

The petitioner says that the commissioner, in fixing the amounts of the awards, probably took into account a smaller sum as the damages on December 20, 1926, added interest to it and capitalized the total into a figure as of July 3, 1930; and they point out that by this capitalization of interest the claimants

will receive more than on the smaller principal amount with interest from December 20, 1926. There is nothing in the report to show that the commissioner made any such calculations. However that may be, I find that the amounts hereinafter specified in this opinion as awards in death claims represent the damages to the claimants as of December 20, 1926, and should carry interest from that time. To this extent the report of the commissioner is revised in the individual cases hereafter referred to.

Finally, as to the amounts of the awards: The commissioner has mentioned the factors taken into account by him in determining the pecuniary losses, all of which seem to be proper factors. He also makes mention of the weight given to the appearance and behavior of the witnesses while testifying. This, of course, is an element of prime importance. I am quite sensible of the fact that the commissioner had the advantage of seeing the witnesses face to face; yet I believe that in certain of the death cases the figures recommended by him do not properly compensate the next of kin for their pecuniary losses. I do not mean to intimate that the commissioner was bound to accept as true the testimony of an interested witness as to what the earnings of the deceased had been or as to what his contributions had been. That such testimony was uncontradicted does not alter the case; in some instances, it was too vague and indefinite to render contradiction possible.

*Roy Amlaw, Deceased.* The death of this man was satisfactorily established. Two claims were filed, one by a divorced wife with three children, the other by the wife to whom the deceased was married at the time of his death. The commissioner ruled that the divorced wife had no standing to recover damages, which is obviously correct, and recommended an award of $12,000 for the benefit of the widow and of the three children by the former marriage. This man had not supported his children for years, although under order of court to do so. In view of the proof as to the career of the deceased, the fact that while living he had provided very meager support to his dependents, and all the circumstances of the case, I am of the opinion that the amount recommended is fair and reasonable. (In this case, as in all other death cases later discussed, the amount fixed by me represents the damages as of December 20, 1926, and will carry interest from the date of death, and it is with this qualification that the amount which has been recommended by the commissioner is approved.)

Funeral expenses in the amount of $213 are also allowed, making the total award in this case $12,213. Nothing should be paid over to the administratrix until there is security that the three children by the former wife will receive their proper share of the recovery.

*Joseph Bassnet, Deceased.* There is doubt whether this man was one of those who perished in the disaster. A corpse was identified as his, but there is also testimony that this body was in fact that of Clifford Rawlins. The commissioner found that the identity of Joseph Bassnet was shown. I am in agreement with this finding. The amount recommended by him is $10,000, which I believe is proper.

*Thomas Davis, Deceased.* This claim is filed by Bessie Davis, wife of a man by the name of Thomas Davis. No body identified as that of Davis was ever recovered from the river. The commissioner, in concluding that such a man was aboard the Linseed King on the fatal trip, said that his name appeared on the employer's list of men who had been engaged to unload the ship. This is a mistake, induced no doubt by a similar mistaken statement in the claimant's brief. No such name was on the list. The only testimony tending to place a Thomas Davis on the launch is that of Louis Skeers and William Morris, together with that of May Skeers. Skeers and Morris say that Thomas Davis lived with them, that they walked down to the pier with him before daylight on the morning in question, and that, although they did not board the launch, they saw Davis do so. May Skeers corroborated them in part. This story, while unusual, is not so improbable as to be unworthy of belief. The matter turns on the credibility of these witnesses, and I am not prepared to say that they were not telling the truth. The commissioner saw them, and was apparently impressed by their story, for in his report he mentions Skeers' testimony. While the proof is not strong, I have reached the conclusion that the Thomas Davis who lived with the Skeers did lose his life on the Linseed King.

The petitioner insists that, even if this is true, there is nothing to show that the Thomas Davis who lived with the Skeers is the Thomas Davis who was the claimant's husband. The Thomas Davis who stayed with the Skeers had been there for several years, with a woman known as Catherine Davis. She had been living with him for two years and passed as his wife. The Skeers had never heard of Bessie Davis, the claimant, until after the accident. The Thomas Davis who married the claimant in 1922 had

lived with her until 1924, when she went on a visit to Chicago. He lived with her again early in 1925, until she departed again for Chicago. She stayed in Chicago thereafter, except for a brief time in 1926, while her husband remained in New York. The claimant did not know where he lived here and did not know the Skeers. These facts certainly tend to show a lack of identity. In favor of identity, we have the identity of names, the fact that the claimant's husband has not been seen since the disaster, the fact that he was a longshoreman, and the very significant fact that Catherine Davis did not turn up as a claimant in this case. I believe that the Thomas Davis who lived with the Skeers and who perished on December 20, 1926, was probably the claimant's husband. The real relationship between him and Catherine Davis is not hard to surmise, nor is it strange, in view of this, that Bessie Davis and Louis Skeers had not heard of one another. The case is a very close one, but it seems to me that on the whole case the claimant has established both the death of Thomas Davis and her own status as his wife, and I will not disturb the commissioner's findings in these respects.

The commissioner found damages at $4,000. Thomas Davis had no steady job. His earnings were meager. When he and his wife lived together, they stayed with her mother. He was living with another woman at the time of his death, and had not contributed anything to his wife's support for several months. He was living here, she in Chicago, and she did not even know where he was living here. In view of these facts, I think that $5,000 is a fair and reasonable estimate of the claimant's pecuniary loss, and I will accordingly make an award of $5,000.

*David Hicks, Deceased.* This man unquestionably lost his life in the disaster. He left a widow and small daughter, in addition to several grown children. Hicks was an elderly man, and his record of employment was not continuous. His wife was obliged to get outside employment. The widow seems to have been a frank and fair witness. The commissioner recommends an award of $7,500. The claimant does not object to this amount, but the petitioner excepts to it as excessive. In my opinion, the amount recommended is fair and reasonable. An undertaker's bill for $227.20 is also allowed, making the total award $7,727.20.

*McBean H. Ifill, Deceased.* I am satisfied that this man was one of those who perished on the Linseed King. The claim is by his wife. The only question relates to the damages. The commissioner recommended $10,000. The proof as to Ifill's past earnings is not clear-cut and definite, but, under all the circumstances of the case, I will not disturb the commissioner's recommendation. The award is $10,000.

*Matthew Leibold, Deceased.* No body identified as that of Leibold was ever recovered. There is no reason for believing that any such man was on board the Linseed King, beyond the testimony of the claimant, his alleged widow, who says that early on the morning of December 20, 1926, Leibold left home with the remark that he was going over to the Linseed King. It was shown that Leibold could not possibly have caught the boat if he had left home at the time set by the claimant. It was also shown that the claimant was then living with a Filipino called Pages, and that she herself went under the name of Pages. No one by the name of Leibold lived with her or was known to the other tenants in the house. Other evidence wholly at variance with the claimant's story was received. The claim is a fabrication, and the commissioner's refusal to recommend an award was right.

*Andrew S. Murphy, Deceased* The decedent was survived by a widow and son, but the widow died two years after the accident. It is hard to glean from the record any definite data as to Murphy's past earnings or future prospects. In view of all the circumstances, I believe that the damages in this case amount to $7,000, rather than $5,000 as recommended. The award will be $7,000.

*Alfred Roberts, Deceased.* I have already indicated the reasons for my conclusion that this claim is cognizable in admiralty, despite the fact that Roberts was an employee and lost his life in an accident arising out of and in the course of employment. He was survived by a widow and small daughter. The commissioner fixed the damages at $14,000.

I am of the view that this amount is inadequate. Roberts was thirty years old. He had had a better education than the average of the men lost in this disaster. He had been a noncommissioned officer in the army, which tends somewhat to show that he possessed qualities of leadership. The testimony taken at the trial before Judge Hazel, as well as the testimony before the commissioner, leads one to believe that Roberts was an intelligent, capable, and dependable man. His earnings, while not large at the time of his death, had been steadily increasing, and I think that his chances of advancement in later years were good. The damages sustained were in my

opinion $20,000, and the award will be for that sum.

*Paul Saul, Deceased.* The deceased was survived by a widow living in Europe. He was a seaman. The commissioner recommended $4,000. In view of his age, his contributions to his spouse, and other circumstances, I have concluded that the pecuniary loss was $6,000. The award will be $6,000.

*Arthur Johnson, Deceased.* In this case, the claimant called herself the widow of the deceased. She first testified to a ceremonial marriage in Virginia in 1922. When this story was proved untrue, she abandoned it and shifted to a common-law marriage. It was shown, however, that she had been ceremonially married to one Hendricks in 1910, and that this husband was apparently still living in 1926. Even if we forget this element, there is nothing to indicate a common-law marriage. The claimant told so many different stories that her entire testimony is unworthy of belief. It is doubtful whether the deceased even cohabited with her except at casual times. There is no foundation for this claim, and the commissioner was right in recommending dismissal.

*George Sims, Deceased.* This claim is likewise made in behalf of an alleged common-law wife. The deceased was also survived by his mother. He had no children.

The claimant, known as Geneva Sims, had been ceremonially married to one Neal in 1919 and had two children by him. Neal deserted her. She commenced living with Sims in 1922 or 1923, and began to use the name Sims. At this time she and Sims were living with her mother. A year or two later Neal died, and she claims that, when they heard of his death, Sims and she said to one another that from then on they would be husband and wife. They then moved to another house. Their cohabitation continued down to the time of Sims' death. There was also testimony by several friends that Sims had introduced the claimant to them as his wife. The commissioner concluded that the alleged common-law marriage did not exist in this case.

I am of the opinion that the commissioner was right. The law does not look with favor upon the connection usually indicated by the expression. It is notorious that, after a man's death, a woman frequently turns up as his "common-law wife" and seeks by fraud to gain a share of his estate. She may have been his mistress or she may not have borne even that relationship to him. It is therefore sound law and sound policy to scrutinize all such claims closely and to require strong proof in support of them.

"The validity of any alleged common-law marriage is always open to suspicion. Especially is doubt justified when one of the parties is dead. Clear, consistent, and convincing evidence is required to establish the fact." Boyd v. Boyd, 252 N. Y. 422, 428, 169 N. E. 632, 634.

In this case the relationship was unquestionably meretricious at the outset; the husband of the claimant was still living. Under such conditions, there can be no marriage, even though cohabitation is continued after removal of the impediment, unless there is unequivocal proof of a change in the status of the parties. Hill v. Vrooman, 215 App. Div. 847, 213 N. Y. S. 256; Id., 242 N. Y. 549, 152 N. E. 421; Collins v. Voorhees, 47 N. J. Eq. 555, 22 A. 1054. The case is at best a doubtful one, which means that the conclusion of the original trier of the fact, who had the witnesses before him, should not be disturbed. Boyd v. Boyd, supra.

I confirm the commissioner's recommendation that Geneva Sims should receive no award. The commissioner recommended that $2,500 be awarded for the mother, Amy Sims. In my opinion, the damages sustained by the mother were $4,000, and an award in this amount for the benefit of the mother will be made.

*Joseph Claudius Viscay, Deceased.* Two claims have been filed to recover for the death of Viscay. The first is by Rose Viscay or Rose Jones, who asserts that she is the common-law wife; the second is by one Rockwood in behalf of Edmund Viscay, a son of the deceased by another woman.

The commissioner found against Rose Viscay. I have read the testimony with care, and have reached the same conclusion. It seems that she did cohabit with Viscay for over a year. But it was shown that Viscay had had similar affairs with at least two other women, and that Rose had a somewhat similar career. She vigorously denied the charges against her, but the commissioner, who had the advantage of seeing and hearing the witnesses, did not believe her. She stated several times that she had never been married to any one, and went so far once as to say that she did not believe in matrimony. The relationship was undoubtedly meretricious at first and remained so throughout. Neither party considered the connection a permanent one.

As to the alleged son, Edmund Viscay, the commissioner was inclined to find against

him, but left the matter open for further proof. The claim is that this boy is the child of the deceased and Emily Rockwood, his common-law wife. The boy was born in 1917. Emily Rockwood was ceremonially married to one Cain in 1916. In view of this, it is difficult to see how the boy could be the legitimate son of Viscay. I am of opinion that the association between Viscay and Emily Rockwood was of the same character as his later association with Rose Jones. The proof is quite clear on the point. The application to take further testimony is denied and the claim is dismissed.

*John Brennan, Deceased.* John Brennan was a seaman. There is doubt whether he lost his life on the Linseed King. The commissioner resolved the doubt against the petitioner, and I concur with him that the body identified as that of Thomas Brennan was in fact that of John Brennan. Brennan was single; his next of kin being his father and mother living in Ireland. His employment was sporadic, and his contributions to his parents varied according to his job. The commissioner recommended an award of $3,000. After a careful study of the testimony, I have concluded that $4,000 represents the pecuniary loss to the mother, and the award will be for such sum.

*Thomas Anthony Connolly, Deceased.* The death of this man is undisputed. He lived with his mother and brother in New York City and contributed toward his mother's support. He was twenty-eight years old, unmarried. He had no regular occupation, and worked wherever he could find a job. The commissioner recommended an award of $2,500. I believe that this amount is too small, and find the damages to be $5,000. Funeral expenses of $482 were proved. I will allow $275 for funeral expenses, making the total award $5,275.

*Joseph Dobransky, Deceased.* The body of this man was found on the launch. He was unmarried, and was survived by an aged mother living in Poland and eight grown brothers and sisters. The mother claims that he sent about $100 a year to her. Under all the circumstances, the contributions made to the mother, and her short expectancy of life, the amount recommended, $2,000 for the mother, seems fair. To it will be added the sum of $250 as funeral expenses, making the total award $2,250.

*William Graham, Deceased.* This claim is filed by a second cousin. There is nothing to show that Graham is dead or that he was on the Linseed King. Nor is there anything to show that he had ever contributed to the support of his second cousin, the claimant. There is no reason to believe that he would ever have given her anything. The commissioner's recommendation of dismissal is confirmed.

*Samuel Griffith, Deceased.* The body of this man was never found. His name does not appear on any records of the petitioner as an employee or prospective employee. The proof as to his death rests upon the testimony of two survivors who say they saw him on the launch, together with the statement that he has never been seen since. These two witnesses appear to have been believed by the commissioner. There is nothing improbable in their testimony, and it seems to me that the death of Griffith was satisfactorily proved. The next of kin were a father and mother living in Barbadoes. The deceased seems to have sent money to them, although the amounts do not appear. I will confirm the recommendation of the commissioner and make an award of $2,000.

*John Hartman, Deceased.* The death was clearly established. The deceased was survived by his mother, brothers, and sisters. His mother was supported in part by his contributions, and is sixty-one years of age. I have concluded that the damages sustained by the mother were $5,000, rather than $2,500 recommended by the commissioner. The funeral bill up to $275 will be allowed, and the total award will be $5,275.

*James Heap, Deceased.* This young man was survived by a father and mother living in England. He had been a steward on passenger ships, but was unemployed at the time. The pecuniary loss seems to have been reasonably estimated by the commissioner at $4,000, and this amount will be awarded as damages.

*Harry Jackson, Deceased.* The claim is by Julia Jackson, a sister of the deceased. There is no clear proof that any such person lost his life on the Linseed King. His body was never recovered, and the petitioner has no record of his having applied for a job. The only evidence connecting him with the disaster is the testimony of the claimant, who says he left home on the morning in question in answer to the petitioner's advertisement for help, and the testimony of a friend who claims to have accompanied him to the pier. The claimant also says that she identified a hat at the police station as belonging to her brother. The story told by the friend is so incredible, and the claimant herself was so thoroughly discredited, that no faith can be

put on their testimony. As to the amount of the damages, the claimant told a tale of her brother earning large sums and showering her with money in the most lavish manner, despite the fact that on her own story he was seeking a job with the petitioner as an unskilled laborer at forty-eight cents an hour. She testified repeatedly that her husband had died in 1917 and stuck to her story until she was confronted by her deceased husband in court. She then was obliged to admit that she had known him to be alive all along and that she had recently been in touch with him. It is only fair to the husband to state that he was in no way cognizant of the claimant's attempted fraud. The commissioner recommended an award of $1,000. There is no credible proof in the case, and no award will be made to this claimant.

*John W. Kakos, Deceased.* The body of a white man was found floating in the Hudson about three months after the accident. In one of his pockets there was a clock-check issued by the petitioner, No. 3113. The petitioner's records show that this check had been given to a man who called himself William Kenny and who had applied for work two or three days before December 20th. The issue is whether Kakos and Kenny were the same man. The commissioner reached the conclusion that they were the same, and recommended an award of $4,000 to Kakos' father. If the testimony of the father is to be believed, there is a sufficient basis for the commissioner's finding. The father testified that his son used both names and that he had received a letter from his son a day or so before the accident to the effect that he had obtained a job with the petitioner. Immediately after the body was found and the name of Kenny was connected with it, the police notified Kakos' brother, which tends to show that the Kakos family had asked the police for information as to Kenny before they could have known that the corpse was that of a man passing as Kenny. This is corroborative of the father's story, and tends to clear the case of any suspicious atmosphere. There was testimony offered by the petitioner looking the other way. The issue is a close one, but, on the entire case, I am of the opinion that the claimant has established by a preponderance of proof that the body taken from the river was that of his son, John W. Kakos. I am fortified in this opinion by the views of the commissioner, who saw the father on the witness stand, had an opportunity to consider his demeanor, and evidently believed his testimony. The amount of damages recommended is $4,000. In my opinion, the amount should be $5,000. Funeral expenses, to the amount of $275, will also be allowed, and the total award will be $5,275.

*Anthony Warren McGoldrick, Deceased.* The death of this man is established by the fact that his body was found on the launch. He left a mother, with whom he lived, as well as four brothers and four sisters. All but two of the brothers and sisters were of full age. He was in the twenties, and was apparently an unskilled laborer. On the entire case, I believe that the award recommended, $4,000, is somewhat inadequate, and that the amount should be $5,000. Funeral expenses not to exceed $275 are also a proper item of damage, making the total award in this case $5,275.

*Marcus Gonzales Navas, Deceased.* The death of this man is undisputed. The only issue relates to the damages. The commissioner recommended $2,500. Navas was survived by two sisters who lived here with him. Their testimony is to the effect that they had been supported by their brother, who had turned over his entire wages to them, and that since his death they had been obliged to get work. It appears, however, that these two sisters had entered the United States only two months before the accident, and had then declared that they were able to earn their own livelihood. It is to be presumed that they would have been working at the time of their brother's death but for the fact of their recent arrival here. The brother had been earning something over $30 a week for several months prior to the accident, and was apparently an unskilled laborer. I believe that the amount recommended will not fully recompense the sisters for their pecuniary loss, and find that such loss is $4,000. The award in this case will be $4,000.

*Bert Ramsland, Deceased.* Ramsland was one of the men who had applied for work prior to the accident. A body identified as his was taken from the river three months later. There is no direct evidence that he was lost in the Linseed King, but, in my opinion, the circumstantial proof of that fact is convincing. He was survived by two brothers and a sister, all adults. He did not contribute to their support to any extent, and none of them had seen him in years. No dependency was proved. In view of these facts, the amount set by the commissioner, $1,500, seems proper, to which will be added the amount paid for the funeral, up to $275. The award will therefore be $1,775.

*Darnelly Barker.* This case, as well as

the cases discussed hereafter, involves a survivor of the accident and is for personal injuries. Barker was an employee of the petitioner, but from the testimony appears to have been working as a longshoreman. His case is therefore properly before this court. The amount recommended by the commissioner, $1,000, is fair compensation for the injuries, and will be the amount of the award.

*Carl Bremer.* Bremer was seeking employment. He undoubtedly suffered from immersion and exposure, but no permanent injuries or diminution of earning capacity are shown. The amount recommended, $500, is fair and reasonable.

*James P. Campbell.* Campbell boarded the boat in response to the petitioner's advertisement. In addition to exposure and tonsilitis, he sustained a cut on the hand from smashing a window in his escape from the cabin. His earning capacity has not been impaired. The amount recommended, $500, is proper, and will be the award.

*Frank Charles.* This claimant asserted that the accident had left him in a nervous condition. The commissioner found, however, that there was no substance to the claim, judging from the man's appearance and conduct as a witness, and concluded that the injuries incurred were only temporary. From a reading of the record, I think that the commissioner's conclusions were sound, and that the figure specified by him, $500, is adequate.

*Aaron Cooper.* This claimant, a nonemployee, also set up permanent injuries. The issue as to whether there were permanent injuries is one of fact, and was resolved by the commissioner against the claimant. The amount set forth in the report, $500, is approved.

*Harry Gold.* The claimant alleged and attempted to prove permanent injury to his nervous system. The weight of evidence is to the contrary. The commissioner's award of $750 to cover the temporary disability is approved.

*William Ice.* This claimant suffered from exposure, and was laid up for one week. Several weeks later he contracted pneumonia. The proof tends to show that the pneumonia was not traceable to the accident. The recommended award of $500 will stand.

*Frederick Ludwig.* This claimant testified to injuries of a permanent sort and to large earnings prior to the accident as contrasted with more modest wages since. The claimant has no just grievance over the figure recommended, $1,000, and it will be confirmed.

*Padro Mitchell.* Mitchell is undoubtedly in poor physical condition at the present time. The evidence, practically undisputed, shows that his ailments are due to syphilis contracted prior to the accident and apparently not aggravated by it. The case is therefore one of temporary disability, so far as the petitioner's liability is concerned. The claimant received $255.50 from the petitioner and signed a release. The commissioner doubted whether Mitchell fully understood the effect of the release, and recommended an award of $300 in addition. Mitchell has no fair grievance with the result, and the commissioner's action is approved.

*Kenneth Norgrove.* Norgrove was not listed by the petitioner as an employee. He testified that he had been employed previous to the accident. However that may be, his work had been unloading ships, and therefore the Compensation Act has no application. His injuries were not permanent. The amount fixed by the commissioner, $500, is reasonable, and is approved.

*Robert L. Proven.* This claimant was a ship steward temporarily out of employment. He suffered from exposure and from cuts on the arms and legs. The commissioner found $500 to be fair compensation, and the award will be for this amount.

*John Joseph Sullivan.* In addition to temporary disabilities, this claimant claims injuries of a more permanent nature. Numbness of hands and sleeplessness are said to have resulted from the accident. The commissioner found, however, that there had been no real impairment of earning capacity. The issue was purely one of fact, and the decision of the commissioner on that issue was not without evidence to sustain it. The amount recommended, $500, will stand as the award.

The judgment will be settled upon five days' notice.